[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  20-13715

_____

D.C. Docket No. 1:19-cv-24706-DLG

LINDSAY RAFFERTY,

Plaintiff - Appellant,

versus

DENNY'S, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 15, 2021)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

ROSENBAUM, Circuit Judge:

We've probably all read stories about a few fortunate food servers collecting incredibly generous tips.[1]  While that, of course, is not the norm,[2] even the best servers with the most magnanimous customers cannot earn tips during the periods their employers require them to engage in non-tipped work.  So the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), and the regulations the Department of Labor has promulgated to effectuate it impose rules to ensure that tipped employees—who receive sub-minimum hourly wages with the expectation that tips will be high enough to bring their hourly rates to at least the minimum wage—spend the bulk of their time working in tip-producing tasks.

Plaintiff-Appellant Lindsay Rafferty, who worked as a server at a Denny's restaurant, contends that Defendant-Appellee Denny's, Inc., failed to comply with these rules.  Instead, Rafferty claims, Denny's required her to spend much of her time performing untipped duties related to her tipped work and untipped duties that had nothing to do with her tipped work.  As a result, she asserts, Denny's paid her the sub-minimum hourly wage for time she worked in non-tip-producing tasks as well as in her tipped occupation.  Rafferty also claims that Denny's violated the

---

[1] *See*, *e.g.*, Jill Harness, *9 Amazing Tipping Stories*, Mental Floss (April 10, 2019), https://www.mentalfloss.com/article/50592/9-absolutely-amazing-tipping-stories.

[2] *See*, *e.g.*, Dan Sweeney, *Servers share their worst tipping tales, from 3 percent on a $600 tab to Huggies coupons*, The Sun-Sentinel (Aug. 10, 2018), https://www.sun-sentinel.com/news/sound-off-south-florida/fl-reg-tipping-follow-20180810-story.html.

FLSA by failing to provide the FLSA-required notification to her of the tip rules. Denny's moved for and prevailed on summary judgment on all counts.

After careful consideration and with the benefit of oral argument, we now conclude that genuine issues of material fact concerning Rafferty's non-tipped labor claims preclude the entry of summary judgment. But we agree with the district court that Denny's was entitled to summary judgment on Rafferty's FLSA notice claims. We therefore affirm in part and reverse in part the judgment of the district court and remand for further proceedings.

## I.

### A.    Factual Background

Lindsey Rafferty joined the Denny's team as a server at one of its Akron, Ohio, locations in February 2012. Besides waiting on tables, Rafferty also had to perform some other tasks for her job. When she spent time on these other duties, Rafferty did not interact with customers and could not earn a tip. Denny's required Rafferty to engage in these non-tipped duties before, during, and after every shift worked.[3]

Rafferty's untipped duties that, according to Rafferty, were related to her occupation as a server consisted of cutting all salad-bar items and filling and

---

[3] Because we are reviewing an order on a motion for summary judgment, we recite the evidence in the light most favorable to the nonmoving party—here, Rafferty. *See Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015). The actual facts may or may not be as alleged.

3

refilling the salad bar; stocking all premade dressings; slicing fruits; emptying, cleaning, and refilling all flavored syrup containers; cleaning throughout the front of the restaurant; cleaning, filling, and refilling the server line; cleaning and stocking the drink stations; and rolling silverware by hand into individual place settings. During any given shift, Rafferty testified, she spent between "30 and 50 percent of the time" doing these tasks.

Denny's also required Rafferty to engage in various duties that Rafferty viewed as unrelated to her occupation of serving customers. These included preparing all side and entrée salads and other food items in the back of the restaurant; greeting and seating customers; answering phones and working the cash register; bussing tables; preparing and plating desserts; handling takeout and delivery orders over the phone and from walk-in customers; managing and fulfilling orders from food delivery apps, including Uber Eats, Grubhub, and DoorDash; sweeping and mopping; wiping down the microwave and stoves; cleaning and wiping counters; washing and scrubbing walls; breaking down and cleaning the soda, juice, and coffee machines; wiping down blinds and light fixtures; cleaning chairs; cleaning and scrubbing refrigerators, the ice-cream freezer, sinks, trays, and bins; emptying, washing, and refilling all salt, pepper, syrup, and condiment dispensers, and sugar caddies; detail cleaning the salad bar; and detail cleaning the expeditor line.

4

Throughout Rafferty's time working as a server for Denny's, Denny's paid Rafferty as a "tipped employee" under the FLSA.[4]  That means Denny's paid her at a rate below the minimum wage, with the expectation that she would make up the rest of her wage rate (at least to the minimum wage) through tips.  Denny's claimed a "tip credit" for the amount between what it paid her and the minimum wage.  *See* 29 U.S.C. § 203(m)(2)(A).

Rafferty was required to accurately report all cash tips she received during each shift when she clocked out.  If, in any given workweek, a tipped employee reported less in tips than necessary to make up the difference between her wage rate and the minimum wage, Denny's claimed it automatically paid the difference.  But Rafferty asserts that Denny's paid her less than the minimum wage and claimed a tip credit on *all* hours worked, regardless of whether she served customers or engaged in non-tip-producing work.  She left her job with Denny's in October 2018.

## B.    Procedural Background

Not that long afterwards, Rafferty sued Denny's in the United States District Court for the Southern District of Florida.  She alleged violations of the FLSA and sought to bring claims on behalf of herself and all similarly situated tipped employees who were subject to Denny's alleged policy or practice of paying these

---

[4] The FLSA defines a "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t).

5

employees sub-minimum hourly wages in violation of the tip-credit provisions of the FLSA. Though six more plaintiffs opted into this collective action over the course of the district-court proceedings, the district court found them not to be similarly situated to Rafferty. So it ultimately dismissed them without prejudice, leaving Rafferty as the sole remaining plaintiff.

Rafferty's complaint alleged three counts under the FLSA. In Count One, Rafferty asserted that Denny's had failed to provide its employees with appropriate notice of the tip credit it claimed under the FLSA. Count Two contended that Denny's took the tip credit for employees' time when they were required to engage in untipped duties unrelated to their occupation as servers. And Count Three complained that Denny's claimed the tip credit for employees' time even though the employees were required to work more time than permitted in non-tipped so-called related duties. Denny's moved for summary judgment on all counts, and the district court granted Denny's motion.

As to Count One, the district court found "no genuine issue of material fact regarding Denny's compliance with the tip credit notice requirements set forth in in 29 U.S.C. § 203(m) and 29 C.F.R. § 516.28(a)(3)." On appeal, Rafferty argues that Count One also included a second theory warranting Denny's liability for allegedly violating the notice requirements contained in § 203(m): that Denny's violated the FLSA by not providing updated notice each time the amount of the tip

6

credit changed. The district court declined to consider this argument because it concluded that Rafferty did not allege this theory in her complaint. And even if she had, the district court reasoned, Denny's gave notice of the required information, sufficient to satisfy 29 C.F.R. § 516.28(a)(3), through its online "Workday" portal.

To resolve Counts Two and Three, the district court relied on a 2018 Opinion Letter that the Department of Labor ("DOL" or "Department") issued interpreting the dual-jobs regulation. Based on this letter, the court held that Rafferty's claims failed because she had not provided any evidence that she had conducted "sidework" at any time that was not "contemporaneous" with her tip-related activities.

Rafferty timely appealed.

## II.

We review *de novo* a district court's grant of summary judgment and apply the same legal standards that governed the district court, viewing all evidence and drawing all reasonable inferences in the nonmoving party's favor. *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7

## III.

### A.    Material issues of fact exist concerning Rafferty's dual-jobs-regulation claims (Counts Two and Three), so summary judgment was not appropriate

Rafferty alleges in Counts Two and Three that Denny's violated the Department's dual-jobs regulation in two ways.  In Count Two, she asserts that Denny's took the tip credit for hours she worked on duties unrelated to her primary occupation as a server.  And in Count Three, Rafferty contends that Denny's claimed the tip credit for hours she worked excessively in untipped duties that were related to her primary job.

Before we analyze these claims, in Section III.A.1, we review the applicable statutory and regulatory background because understanding them is necessary to applying the governing analytical framework.  Section III.A.2 considers whether deference to the Department's 2018 Opinion Letter's interpretation of the dual-jobs regulation is appropriate and then construes the dual-jobs regulation.  And having established in Sections III.A.1 and III.A.2 the proper analytical framework for assessing Rafferty's dual-jobs claims, in Section III.A.3, we evaluate whether material issues of fact remain concerning Rafferty's dual-jobs claims.

8

## 1.

a.    29 U.S.C. § 203(m):  the Tip-Credit Provision

Congress enacted the FLSA to ensure "all able-bodied working men and women a fair day's pay for a fair day's work."  *Watkins v. City of Montgomery, Ala.*, 775 F.3d 1280, 1283 (11th Cir. 2014) (citation omitted).  Congress also sought "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."  *Schumann*, 803 F.3d at 1207 (citation omitted).

Towards this end, the FLSA establishes a minimum wage that covered employers may pay.  *See* 29 U.S.C. § 206(a).  But exceptions exist.  *See* 29 U.S.C. § 206(a)(1).  One of these exceptions applies to wages an employer pays a "tipped employee," which, as we have noted, the FLSA defines as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. § 203(t); *see also* 29 C.F.R. § 531.56.

Title 29, United States Code, Section 203(m) codifies this provision.[5]  It authorizes an employer to pay a tipped employee less than the minimum wage,

---

[5] Section 203(m)(2)(A) provides, in relevant part,

(A) In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

provided that the tips the employee receives at least make up for the difference between what the employer pays and the minimum wage. In addition, § 203(m) provides that it can be applied to only those tipped employees whom the employer has informed of § 203(m)(2)(A). This subsection is sometimes referred to as the "tip-credit provision" of the FLSA.

Congress added the tip-credit provision to the FLSA in 1966. *See* Fair Labor Standards Act Amendments of 1966, Pub. L. No. 89-601, § 101, 80 Stat. 830, 830 (1966). In these same amendments, Congress authorized the Secretary of Labor "to promulgate necessary rules, regulations, or orders with regard to the amendments made by this Act." *Id.* at § 603, 80 Stat. at 844.

---

(i) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

(ii) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in clause (i) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m)(2)(A).

10

b.     29 C.F.R. § 531.56:  the Dual-Jobs Regulation

One year later, the Department of Labor ("Department" or "DOL") exercised this authority and promulgated a series of regulations to implement the tip credit.  At the heart of this appeal is a subsection of one of these regulations: the so-called dual-jobs regulation.

The dual-jobs regulation appears in 29 C.F.R. § 531.56, which is aimed at clarifying the meaning of "tipped employee" as that phrase appears in the FLSA's definitional provision, 29 U.S.C. § 203(t).  Subsection (e) of § 531.56 states,

> (e) Dual jobs. In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

29 C.F.R. § 531.56(e).

By its terms, the dual-jobs regulation observes that, in some situations, despite performing work for only one employer, an employee works in two

11

occupations. When that happens and only one of the duties is a tipped occupation, the regulation explains, the employer can take the tip credit for only the hours the employee performs her tipped occupation. In contrast, the mere fact that an employee performs some untipped duties that are related to her tipped occupation does not mean that she works in more than one occupation for her employer, and the employer may take the tip credit.

Over the decades that followed the Department's promulgation of the dual-jobs regulation, the Department issued guidance to further clarify the meaning of that regulation. For example, in 1979, the Department issued its first opinion letter addressing the dual-jobs regulation. In that document, the Department considered whether employers could take the tip credit for hours where servers who "report to work two hours before the doors are opened to the public . . . prepare vegetables for the salad bar." It concluded the employer could not. In explaining its reasoning, the Department observed that "salad preparation activities are essentially the activities performed by chefs." Brief for the Secretary of Labor as Amicus Curiae in Support of Plaintiff-Appellants, *Marsh v. J. Alexander's LLC*, 905 F.3d 610 (9th Cir. 2018) (Nos. 15-15791, 15-15794, 15-16561, 15-16659, 16-15003, 16-15004, 16-15005, 16-15118), 2016 WL 3900819 (providing U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. FLSA-895 (Aug. 8, 1979) in addendum).

12

The following year, the Department issued another opinion letter.  *See* U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. WH-502, 1980 WL 141336 (Mar. 28, 1980).  This time, the Department found that an employer could take the tip credit when tipped restaurant employees would "clean the salad bar, place the condiment crocks in the cooler, clean and stock the waitress station, clean and reset the tables (including filling cheese, salt and pepper shakers) and vacuum the dining room carpet, [all] after the restaurant [was] closed."  But the Department cautioned that the result might be different if "specific employees were routinely assigned . . . maintenance-type work such as floor vacuuming."  *Id.*

Another opinion letter followed in 1985.  *See* U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. FLSA-854, 1985 WL 1259240 (Dec. 20, 1985).  In this one, the Department considered a restaurant that routinely assigned one member of the waitstaff responsibility for about two hours of general preparatory activities to be completed before the restaurant opened its doors to customers each day.  Among these activities, the employee had to "[c]ut and clean vegetables for the salad bar.[6]

---

[6] The entire list required the employee to complete these tasks:

> (1) Inspect dining room including windows and sills. (2) Check dining room lights. (3) Set thermostat. (4) Check tables and align table bases. (5) Check high chairs/booster seats. (6) Set tables. (7) Set table arrangers. (8) Clean and fill shakers. (9) Clean/replace ashtrays. (10) Stock waitress station with glasses, cups, mugs, and pitchers. (11) Check supplies of napkins, sugar, straws, etc. (12) Check supply and cleanliness of plates, salad plates and silverware. (13) Set up three (3) compartments, glass washing sink. (14) Check

The Department's analysis proceeded in two steps, implicitly distinguishing between duties that were sufficiently related to a tipped occupation and those that were not. *Id.*

First, addressing what the case law would come to refer to as "unrelated duties," the Department discussed the requirement that the employee cut and clean vegetables for the salad bar. *Id.* Citing both the legislative history to the 1974 amendments to the FLSA and the 1979 Opinion Letter, the Department concluded that no tip credit could be taken for time spent preparing vegetables for the salad bar because "salad preparation activities are essentially the activities performed by chefs." *Id.*

As to the remaining activities listed in the letter, the Department acknowledged that the dual-jobs regulation provides that employers may take the tip credit for time a tipped employee spends in duties *related* to the tipped occupation, even though those duties are not by themselves directed towards producing tips. *Id.* Nevertheless, the Department concluded that the tip credit was not available in this particular scenario because the restaurant was assigning a single employee to perform responsibilities that extended to the entire restaurant,

---

beverage dispensers. (15) Prepare tea (16) At opening, prepare coffee. [17] Cut and clean vegetables for salad bar. [18] Clean and sanitize sneeze shield on salad bar. [](19) Fill salad bar crocks with refrigerated and dry items. (20) Place vinegar and oil cruets at end of salad bar. (21) Race parmesan shaker on salad bar. (22) If iced salad bar, fill ice bin.

14

rather than to the specific area or customers that employee served, and because the non-tip producing activities were required for a substantial portion (30% to 40%) of the employee's workday.

Finally, in 1988, the Department incorporated the interpretation of the dual-jobs regulation advanced in these opinion letters into its Field Operations Handbook ("Handbook"), which stated,

> Reg 531.56(e) permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities). For example a waiter/waitress, who spends some time cleaning and setting tables, making coffee, and occasionally washing dishes or glasses may continue to be engaged in a tipped occupation even though these duties are not tip producing, provided such duties are incidental to the regular duties of the server (waiter/waitress) and are generally assigned to the servers. However, where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing preparation work or maintenance, no tip credit may be taken for the time spent in such duties.

*Marsh v. J. Alexander's LLC*, 905 F.3d 610, 620 n.7 (9th Cir. 2018) (quoting amicus brief from the Department which reprinted Handbook § 30d00 (Dec. 9, 1988)).

This came to be known as the twenty-percent rule, or the 80/20 rule. *See Fast v. Applebee's Int'l., Inc.*, 638 F.3d 872, 881 (8th Cir. 2011). Over the years,

the Department revised the Handbook to clarify that employers could not take the tip credit for time an employee spent performing tasks that were unrelated to a tipped occupation.  So, for example, the 2016 version of the Handbook states,

> (1) When an individual is employed in a tipped occupation and a non-tipped occupation, for example, as a server and janitor (dual jobs), the tip credit is available only for the hours spent in the tipped occupation, provided such employee customarily and regularly receives more than $30.00 a month in tips.  *See* 29 CFR 531.56(e).
>
> (2) 29 CFR 531.56(e) permits the employer to take a tip credit for time spent in duties related to the tipped occupation of an employee, even though such duties are not by themselves directed toward producing tips, provided such related duties are incidental to the regular duties of the tipped employees and are generally assigned to the tipped employee.  For example, duties related to the tipped occupation may include a server who does preparatory or closing activities, rolls silverware and fills salt and pepper shakers while the restaurant is open, cleans and sets tables, makes coffee, and occasionally washes dishes or glasses.
>
> (3) However, where the facts indicate that tipped employees spend a substantial amount of time (i.e., in excess of 20 percent of the hours worked in the tipped occupation in the workweek) performing such related duties, no tip credit may be taken for the time spent in those duties. All related duties count toward the 20 percent tolerance.
>
> (4) Likewise, an employer may not take a tip credit for the time that a tipped employee spends on work that is not related to the tipped occupation. For example, maintenance work (e.g., cleaning bathrooms and washing windows) are not related to the tipped occupation of a

16

> server; such jobs are non-tipped occupations. In this case, the employee is effectively employed in dual jobs.

*Marsh*, 905 F.3d at 619-20 (quoting amicus brief from Department, which reprinted Handbook in effect in 2016).

> We distill this guidance into the following rules:
>
> > (1) An employer cannot take the tip credit for time an employee spent performing duties that were *unrelated* to the tipped occupation.
> >
> > (2) An employer can take the tip credit for time an employee performed duties related to her tipped occupation, provided that those duties were not performed by that employee for more than twenty percent of her working hours.

*See also id.* at 620 ("The Guidance thus clearly contemplates that a server who performs unrelated tasks, such as cleaning restrooms, is a dual job employee entitled to the full minimum hourly wage for her unrelated work. The Guidance also clearly lays out that a server is a dual job employee if her related tasks occupy more than 20% of her hours in a workweek.").

The next thirty years after the 1988 Handbook's issuance of the twenty-percent rule—with one exception that lasted for less than two months—brought much of the same. The Department maintained its position that the twenty-percent rule accurately interpreted the dual-jobs regulation as it governed whether an employer could take the tip credit for time an employee spent performing duties that were not tip-producing themselves, but that were related to the employee's

17

tipped occupation. The sole exception began on January 16, 2009, when the Department issued Opinion Letter FLSA2009-23, which we discuss below. But a mere six-and-a-half weeks later, on March 2, 2009, the Department withdrew that letter and defended the twenty-percent rule in amicus briefs to the Eighth, Ninth, and Tenth Circuits. *See Fast*, 638 F.3d 872 (8th Cir. 2011); *Marsh*, 905 F.3d 610 (9th Cir. 2018); *Romero v. Top-Tier Colorado LLC*, 849 F.3d 1281 (10th Cir. 2017).

Almost ten years after the six-and-a-half-week blip in the Department's thirty-year interpretation of the dual-jobs regulation, on November 8, 2018, the Department reissued the previously withdrawn 2009 Letter verbatim. *See* U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. FLSA-2018-27, 2018 WL 5921455 (Nov. 18, 2018). In this 2018 Opinion Letter, the Department took a markedly different approach to its thirty-year interpretation: it jettisoned any limitation on the amount of duties related to a tip-producing occupation that a tipped employee may perform, "so long as [those duties] are performed *contemporaneously* with direct customer-service duties and all other requirements of the Act are met." *See* U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. FLSA-2018-27, 2018 WL 5921455 (Nov. 18, 2018).

The letter also made another significant change to the Department's interpretation of the dual-jobs regulation. It directed that the Occupational

18

Information Network ("O*NET"), an online database of job characteristics,[7] would be determinative on whether certain duties were "related to a tip-producing occupation." *Id.*

Finally, the 2018 Letter largely maintained the Department's position that employers could not take a tip credit for time employees spent performing unrelated tasks—now defined as those not contained in the applicable O*NET task list. Nevertheless, it did note that some of the time an employee spends performing such tasks may be subject to the *de minimis* rule contained in the Department's Wage and Hour Division's general FLSA regulations.[8]

In February and December of 2019, the Department changed its internal guidance documents to reflect the new approach it announced in the 2018 Opinion

---

[7] O*NET originally obtained the information in its database from occupation analysts. https://www.onetonline.org/help/onet/ (last visited Sept. 15, 2021). But it augments and updates that information through "ongoing surveys of each occupation's worker population and occupation experts." *Id.*

[8] Under the *de minimis* rule, 29 C.F.R. § 785.47, in recording working time under the FLSA, an employer may properly disregard "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes." Courts have held that "such trifles" are *de minimis*. *Id.* (citing *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946)). This rule applies only when such "uncertain and indefinite periods of time involved . . . a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities." *Id.* But it does not allow employers to "arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." *Id.*

Letter.[9]  Despite these changes, district courts nearly unanimously concluded that the 2018 Opinion Letter was not entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), a case we discuss more later.  *See Flores v. HMS Host. Corp.*, No. 8:18-cv-03312, 2019 WL 5454647, at *7 (D. Md. Oct. 23, 2019) (collecting cases).[10]

Undeterred, the Department issued a Notice of Proposed Rulemaking on October 8, 2019, in which it proposed amending the dual-jobs regulation to reflect the approach it took in the 2018 Opinion Letter.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA), 84 Fed. Reg. 53956, 2019 WL 4932754 (proposed Oct. 8, 2019).  On December 30, 2020, the Department issued a final rule incorporating these changes and set it to go into effect on March 1, 2021 (the "2020 Tip Rule").  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA), 85 Fed. Reg. 86756, 2020 WL 7753223 (Dec. 30, 2020). But the rule never became effective.

Instead, on February 26, 2021, after the Department conducted notice-and-comment rulemaking and considered the comments filed, the Department published a final rule extending the effective date of the 2020 Tip Rule until April 30, 2021, to provide the Department with more time to review and consider the

---

[9] On February 15, 2019, the Department issued a Field Assistance Bulletin, and, on December 2, 2019, the Department revised its Handbook.

[10] The district court here was one of the rare exceptions.

effects of the Rule.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA): Delay of Effective Date, 86 Fed. Reg. 11632, 2021 WL 736574 (Feb. 26, 2021).  But the day before the 2020 Tip Rule was set to go into effect, the Department issued another new rule that delayed the 2020 Tip Rule's implementation.  *See* Tip Regulations Under the Fair Labor Standards Act (FLSA): Delay of Effective Date, 86 Fed. Reg. 22597, 2021 WL 1664281 (Apr. 29, 2021) (delaying effective date of 85 Fed. Reg. 86756 until December 31, 2021, and stating that it shared commenters' concerns that the rule announced in 85 Fed. Reg. 86756 may be harmful to both tipped employees and non-tipped employees).[11]

About two months later, on June 23, 2021, the Department issued another Notice of Proposed Rulemaking on the dual-jobs regulation (the "2021 NPRM"). Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 32818, 2021 WL 2551107 (June 23, 2021).  This NPRM proposed the withdrawal of and a new proposal concerning the part of the 2020 Tip Rule concerning when a tipped employee is employed in dual jobs under the FLSA.  *See id.*

---

[11] On January 19, 2021, after the 2020 Tip Rule had been announced but before it was delayed, the Attorneys General for eight states and the District of Columbia filed suit challenging the rule in the United States District Court for the Eastern District of Pennsylvania. *Commonwealth of Pennsylvania*, *et al. v. Scalia et al.*, No. 2:21-cv-00258 (E.D. Pa., Jan. 19, 2021).

In the 2021 NPRM, the Department proposed to amend 29 C.F.R. § 531.56(f) to provide guidance relating to what it means to be "[e]ngaged in a tipped occupation." *Id.* at 32846. This 2021 NPRM returns to the Department's longtime twenty-percent rule and provides additional clarification of that rule.

First, the proposed § 531.56(f) defines certain terms. It explains that "[a]n employee is engaged in a tipped occupation when the employee performs work that is part of the tipped occupation." *Id.* The proposed rule states directly that "[a]n employer may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation." *Id.* In turn, the proposed rule defines "[w]ork that is part of the tipped occupation" as "[a]ny work performed by the tipped employee that produces tips[] [and] [w]ork that directly supports tip-producing work, . . . provided it is not performed for a substantial amount of time." *Id.* And it clarifies that "[w]ork that directly supports the work for which employees receive tips is work that assists a tipped employee to perform the work for which the employee receives tips." *Id.* Conversely, "[w]ork that is not part of the tipped occupation" means "any work that does not generate tips and does not directly support tip-producing work." *Id.* The 2021 proposed rule expressly states that an employer may not take a tip credit for time an employee spends engaging in work that is not part of the employee's tipped occupation. *Id.*

22

Also relevant to work that directly supports tip-producing work, the proposed rule defines "substantial amount of time" to mean more than twenty percent of the hours worked during the employee's workweek or more than thirty continuous minutes. *Id.*

Second, to further illustrate the meaning of these defined terms, the 2021 proposed rule sets forth examples. For instance, the 2021 proposed rule explains the meaning of "tip-producing work" by stating that "[a] server's tip-producing work includes waiting tables." *Id.* And the 2021 proposed rule provides additional guidance concerning servers; it specifies that work that directly supports such tip-producing work "includes, for example, preparing items for tables so that the servers can more easily access them when serving customers or cleaning the tables to prepare for the next customers." *Id.*; *see also id.* at 32829 (further explaining outside the bounds of the 2021 proposed rule that "work that directly supports the work of a server would also include folding napkins, preparing silverware, and garnishing plates before serving the food to customers," as would "[s]weeping under tables . . . if it is performed in and limited to the dining room because keeping the serving area clean assists the performance of a server's tip-producing work"). In contrast, the 2021 proposed rule clarifies that "for example, preparing food or cleaning the bathroom is not part of a server's occupation." *Id.*

23

## 2.

a.    Deference is not due the Department of Labor's 2018 Opinion Letter

Rafferty challenges the district court's deference to the 2018 Opinion Letter,[12] arguing that it is not entitled to either of the forms of deference commonly associated with the Supreme Court's decisions in *Auer v. Robbins*, 519 U.S. 452 (1997), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Instead, Rafferty contends, we should defer to the Department's pre-2018 Opinion Letter interpretation of the dual-jobs regulation.

---

[12] As a threshold matter, Denny's claims that Rafferty waived any argument that the district court should not have deferred to the 2018 Opinion Letter. We disagree. Contrary to Denny's contention, Rafferty's response in opposition to Denny's summary-judgment motion stated,

> Defendant attempts to relieve itself of the burden of complying with Dual Jobs on summary judgment by arguing that the DOL has rescinded the traditional 80/20 Rule for defining the temporal limits of related non-tipped worked and deferring to O*NET to essentially eliminate the distinction between related and unrelated non-tipped labor. Defendant ignores that courts across the country have consistently declined to grant the new DOL guidance deference in favor of the DOL's prior guidance and the 80/20 Rule. Defendant does not attempt to argue how FLSA 2018-27 could possibly be entitled to deference.

In support, Rafferty cited five different district-court decisions that had declined to defer to the 2018 Opinion Letter. Not only did Rafferty's brief preserve the issue, but the district court specifically recognized as much. It wrote in its order, "Plaintiff, in her Response, argues that this Court should follow the reasoning of courts in other circuits, which have disregarded the new DOL guidance in favor of the DOL's prior guidance and the 80/20 Rule. The Court rejects this argument." No waiver occurred here.

We address each contention in turn.  But to anchor our analysis, we begin with a discussion of two types of deference that a court may find applicable to an agency's interpretation of its own regulation.

We start with *Auer* deference.  When a court engages in *Auer* deference, it defers to an agency's reading of its own genuinely ambiguous regulation.  *See Auer*, 519 U.S. at 461 (stating Secretary of Labor's interpretation was controlling unless plainly erroneous or inconsistent with the regulation).  Sometimes *Auer* deference is referred to as *Seminole Rock* deference, after *Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), the case that originally employed it.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408.

As the Supreme Court recently emphasized, *Auer* deference is appropriate only under certain circumstances.  We apply a three-part framework to assess whether *Auer* deference is proper.

First, a regulation must be "genuinely ambiguous."  *Kisor*, 139 S. Ct. at 2415.  A regulation cannot qualify as "genuinely ambiguous" before a court "exhaust[s] all the 'traditional tools' of construction." *Id.* (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  So before resorting to *Auer* deference, a court must "carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.*  (internal quotations and citation omitted).

25

Second, if the regulation satisfies the "genuinely ambiguous" requirement, the agency's reading must be "reasonable." *Id.* That means "it must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2416.

And third, the court must independently examine the "character and context of the agency interpretation" to determine whether it is worthy of controlling weight. *Id.*

When *Auer* deference is not proper, another, somewhat weaker form of deference to an agency's interpretation of its own regulations may apply. Named for *Skidmore v. Swift & Co.*, 323 US. 134 (1944), that form of deference is known as *Skidmore* deference. *See Christopher*, 567 U.S. at 159. Under *Skidmore* deference, courts may give an agency's interpretation only "a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher*, 567 U.S. at 159 (cleaned up). So unlike with *Auer* deference, an agency's interpretation is not entitled to controlling weight under *Skidmore* deference.

      i.    *The 2018 Opinion Letter is not entitled to* Auer *or* Skidmore *deference*

Rafferty contends that the 2018 Opinion Letter is not entitled to either *Auer* or *Skidmore* deference. Denny's disagrees.

26

A.  *The dual-jobs regulation is genuinely ambiguous concerning the amount of time a "tipped employee" can spend doing untipped but related duties and concerning what tasks constitute related duties*

We start with *Auer*'s first prong:  whether the dual-jobs regulation (29 C.F.R. § 531.56(e)) is "genuinely ambiguous," *Kisor*, 139 S. Ct. at 2414, as to the questions at issue here:  How much time can a server spend performing duties related to her tipped occupation that do not produce tips themselves before she is no longer considered a "tipped employee" during the time she performs those non-tip-producing duties (the "non-tipped time" issue)?  And what duties are related to the occupation of a server (the "related-duties" issue)?

Here, the parties agree that the regulation is "genuinely ambiguous" on these points.  After considering the text, structure, history, and purpose, we reach the same conclusion.

To be sure, the text of the dual-jobs regulation provides some guideposts to lead the way on these questions.

With respect to the non-tipped time issue, for example, the regulation states that an employer may take the tip credit for the hours of a waiter "who spends *part of her time* cleaning and setting tables, toasting bread, making coffee and *occasionally* washing dishes or glasses."  29 C.F.R. § 531.56(e) (emphasis added).  The terms "part of her time" and "occasionally" impose a limit on the amount of time an otherwise tipped employee may spend doing untipped work before the

27

employer can no longer claim the tip credit.  The dictionary defines "part" as "[a] portion, division, piece, or segment of a whole."  Part, *The American Heritage Dictionary*, at 1280 (4th ed. 2000).  And "occasionally" means "[o]ccurring from time to time[;] [n]ot habitual; infrequent."  Occasional, *The American Heritage Dictionary*, at 1215 (4th ed.).  So we know that, for an employer to be entitled to the tip credit for the entirety of an employee's hours, the employee may perform non-tipped work related to her duties, but that must occur no more than "infrequent[ly]."  While that eliminates some possibilities (e.g., we know the employee must not engage in non-tipped work often), we don't know—and it's not clear—where exactly we draw the line between time that qualifies as "infrequent" and that that does not.[13]  *See Fast*, 638 F.3d at 877; *see also Marsh*, 905 F.3d at 624-625.

As to the related-duties question, the dual-jobs regulation sets forth three examples to illustrate the difference between related duties and unrelated duties. The first example involves an employee who works both as a maintenance employee and as a waiter at the same hotel.  29 C.F.R. § 531.56(e).  The regulation tells us these duties are not related but instead constitute "two occupations," and the tip credit is available only for the server hours.  *Id.*  The second example

---

[13] Most respectfully, we do not think our colleague's test, which likens the meaning of "occasionally" to what his friend who says she "occasionally" goes to the mall means, illuminates the answer to this question.  *See* Concurrence at 76-77.

28

describes the waiter we discussed above and concludes that her duties "cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" are related. *Id.* And the third example speaks of a counter employee "who prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group." *Id.* Those duties, too, are related, the regulation concludes. *Id.*

But the regulation sets out no test, definition, or other analytic tools to allow a court to ascertain what constitute "related" duties and what do not and what demarcates a separate "occupation." *See Fast*, 638 F.3d at 877; *see also Marsh*, 905 F.3d at 624. We don't know whether duties must be directly related, closely related, or logically related. Nor do we know whether indirectly related duties can qualify.[14] And the examples the regulation sets out do not shed much light on the answers to some of the precise questions here: whether preparing all side and entrée salads and other food items in the back of the restaurant; greeting and seating customers; answering phones and working the cash register; preparing and plating desserts; sweeping and mopping; wiping down the microwave and stoves;

---

[14] Again, most respectfully, we do not understand how the Concurrence's footnote 3 helps us to ascertain the meaning of "related" in the dual-jobs regulation. *See* Concurrence at 75 n.3. The Concurrence asserts that "'[d]istinctly related, 'directly related,' and 'indirectly related' are different kinds of relatedness. But they do not mean 'related.' They do not define 'related.' They are their own separate and unique terms with their own separate and unique meanings." *Id*. This type of ivory-tower linguistics, while perhaps interesting, does not help us to answer the very real and practical questions we must address in this case: namely, which untipped duties qualify as "related" for purposes of the dual-jobs regulation.

cleaning and wiping counters; washing and scrubbing walls; breaking down and cleaning the soda, juice, and coffee machines; detail cleaning the salad bar; and detail cleaning the expeditor line are "related duties." So the text is ambiguous. The structure of the regulation likewise offers no answers to the questions we must address here.

Nor do the history and purpose of the dual-jobs regulation. True, we know that Congress enacted the FLSA, in part, to guarantee workers at least a minimum wage. *Schumann*, 803 F.3d at 1207. So we can discern that the dual-jobs regulation must have been intended to be consistent with that purpose. But beyond that, the history of the regulation tells us little. The Department promulgated the regulation a year after Congress amended the FLSA to define "tipped employee" and provide, for the very first time, a formula for calculating a tipped employee's wages. The regulation's purpose, according to the NPRM that eventually led to the dual-jobs regulation, was to "expand 29 CFR Part 531 to make provisions responsive" to the "Fair Labor Standards Act of 1966." 32 FR 222, 222 (Jan. 10, 1967). Yet this NPRM did not specifically mention the dual-jobs regulation, making it difficult to discern much else from the run up to the regulation.

In short, after exhausting our entire analytical toolbox, we must conclude that the dual-jobs regulation is ambiguous as to the non-tipped time and related-

duties issues. *Fast v. Applebee's Inter., Inc.*, 638 F.3d 872, 879 (8th Cir. 2011) (finding the same dual-jobs regulation at issue in Rafferty's case to be "ambiguous" under *Auer* as to the meanings of "part of [the] time" and "occasionally"); *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 623-24 (same).

Before we move on to the next step in the *Auer* deference analysis, we pause to address our colleague's argument that the dual-jobs regulation is not ambiguous, but rather merely "vague," and so it cannot proceed to the second step of the *Auer* deference analysis. *See* Concurrence at 67-68 n.1, 69-74. The Concurrence contends that when *Kisor* said a regulation must have "multiple reasonable meanings," it required, for the first time, that a regulation not be just "vague" or lack precision after the reviewing court applies all the tools in the judicial toolbox to discern its meaning on the specific question at issue, but that it satisfy essentially a term-of-art definition of "ambiguous"[15] before a reviewing court may proceed to *Auer*'s second and third steps. *See id.* We disagree.

---

[15] The Concurrence insists it does not employ a "term-of-art definition or redefinition" but rather that its definition "is how ambiguity is defined." Concurrence at 67 n.1. We agree that the way the Concurrence defines "ambiguity" is one way it can be defined. But, as even the source the Concurrence cites for its specialized definition of "ambiguous" concedes, *see* Concurrence at 67 n.1 (quoting *Ambiguity*, A Dictionary of Modern Legal usage 48-49 (2d ed. 1995) (citation and internal quotation marks omitted), for the proposition, "It is unfortunate that many lawyers persist in using the word *ambiguity* to include vagueness. . . . Of course, even highly reputed legal writers confuse the two terms . . . ."), it is not the common usage of the word. *See*, *e.g.*, *Ambiguity*, *Cambridge Dictionary* (online ed.), https://dictionary.cambridge.org/us/dictionary/english/ambiguity (last visited Sept. 15, 2021) ("(an example of) the fact of something having more than one possible meaning and therefore possibly causing confusion: We wish to remove any ambiguity concerning our demands. There are some ambiguities in the legislation."); *Ambiguity*, *Merriam-Webster Dictionary* (online ed.), https://www.merriam-

First, no matter how much the Concurrence tries to reinterpret the words of *Kisor*, the Supreme Court said no such thing in that case. Though *Kisor* certainly requires courts to exhaust "all the tools of statutory construction" before declaring a regulation ambiguous, that is a far cry from redefining the word "ambiguous" from how the Court has always used that term in *Seminole Rock/Auer* jurisprudence to somehow exclude terms that remain vague or imprecise on the exact question before the court, after the court has employed every tool of statutory construction to try to discern their meanings. In fact, as the Concurrence itself points out, "[r]ight after the phrase 'genuine ambiguity,' the Court quoted from *Seminole Rock* that *Auer* deference should be afforded 'only "if the meaning of the words used is in doubt."'" Concurrence at 70 (quoting *Kisor*, 139 S. Ct. at 2415 (quoting *Seminole Rock*, 325 U.S. at 414)).

Exactly. The Supreme Court cited 75-year-old precedent to explain what it meant by "ambiguous." In other words, the Supreme Court did not attach a new meaning to "ambiguous"; instead, it noted only its intent that the old meaning be enforced. That is, before a court may declare a regulation "ambiguous," it must first exhaust all tools in the statutory-construction toolbox to ascertain the meaning of the regulation.

webster.com/dictionary/ambiguous (last visited Sept. 15, 2021) ("1a: doubtful or uncertain especially from obscurity or indistinctness: eyes of an *ambiguous* color; b: inexplicable; 2: capable of being understood in two or more possible senses or ways: an *ambiguous* smile; an *ambiguous* term; as deliberately *ambiguous* reply"). And as we explain below, it is clearly not the usage of the word that pre- or post-*Kisor Auer* jurisprudence employs.

If, as the Concurrence argues, in three words *Kisor* changed the meaning of "ambiguity" for purposes of the *Auer* deference analysis to the meaning the Concurrence contends, the Concurrence would not need to use multiple pages, the *Peerless*, and chickens to explain that's what *Kisor* means. Indeed, the Supreme Court is certainly capable of saying what it means, and it "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

Second, not only does *Kisor* not affirmatively support the Concurrence's point, but *Kisor* expressly disavows the notion that it represents "any departure from doctrine," noting that it is but one in "a long line of precedents—each one reaffirming the rest and going back 75 years or more." 139 S. Ct. at 2422 (citation and internal quotation marks omitted). And both Justice Kagan's and Justice Gorsuch's opinions recognize that "ambiguity" for purposes of *Auer* deference includes regulations that are "vague" and lack precision.

Justice Kagan, for example, explains that "strong (almost surely stronger) incentives and pressures" encourage agencies to draft their regulations in a way that is not "designed" to be "*vague*[] [after engaging in the first step of the post-*Kisor Auer* framework]." *Id.* at 2421 (plurality opinion) (emphasis added). Rather, she reasons, "regulators want their regulations to be effective, and clarity promotes compliance." *Id.* (alteration, internal quotation marks, and citation

33

omitted).  She continues, regulators aren't the only ones:  "Too, regulated parties often push for *precision* from an agency, *so that they know what they can and cannot do*.  And *ambiguities* in rules pose risks to the long-run survival of agency policy."  *Id.* (emphasis added).  That is so, Justice Kagan writes, because "[v]*agueness* increases the chance of adverse judicial rulings."  *Id.* (emphasis added).  In this passage, she clearly speaks of the type of vagueness that exists after the courts exhaust all tools of construction, requiring courts to then engage in the second and third steps of the *Auer* analysis.[16]

Justice Gorsuch's opinion (joined by three other Justices) shows that he also equates the meaning of pre- and post-*Kisor* ambiguity with vagueness after the full judicial toolbox is employed.  His opinion responds in part to Justice Kagan's point with the following answer:  "Whether or not regulations are '"designed"' to be *vague*, many can be read in different ways, especially when new and unanticipated applications arise; cases like that come before the courts all the time."  *Id.* at 2440

---

[16] The Concurrence does not engage with this point at all, instead simply repeating Justice Kagan's remarks and then opining without basis that Justice Kagan mentioned "vagueness" in the plurality section of her *Kisor* opinion "because vagueness and ambiguity are different legal concepts."  Concurrence at 71.  While we cannot purport to have access to Justice Kagan's thinking on why these remarks appear in the plurality section of the opinion, review of the structure of the opinion and of the Chief Justice's views seems to us to indicate instead that this section is set off from other parts of Justice Kagan's opinion because Chief Justice Roberts upheld *Auer* deference mostly, if not entirely, for reasons of *stare decisis*, so he did not wish to concur in the portion of Justice Kagan's opinion that explained the Court's refusal to jettison *Auer* deference based on the policy reasons for its original adoption.  But regardless of why she put this discussion in a different part of her opinion, the point is the same:  Justice Kagan's opinion clearly equates vagueness after emptying the judicial toolbox with ambiguity for purposes of the *Auer* framework.

(Gorsuch, J., concurring in the judgment) (emphasis added) (citation omitted).  He continues, "Whether purposeful or not, the agency's failure to write a clear regulation winds up increasing its power, allowing it to both write and interpret rules that bear the force of law . . . ."  *Id.*  In other words, Justice Gorsuch takes issue with the *Auer* framework because, in his view, it encourages agencies to write "vague" regulations, their interpretations of which might be entitled to deference without going through the rulemaking procedure.  And since Justice Gorsuch had four votes for his opinion and Justice Kagan had four for the part of her opinion quoted above, that makes at least eight members of the Court[17] who clearly understood "ambiguity" for the purposes of *Auer* deference to include regulations that are "vague" after the court uses all the tools in the judicial toolbox to discern their meaning.[18]

Third, despite the Concurrence's invocation of A. Scalia & B. Garner, *Reading Law:  The Interpretation of Legal Texts* 32 (2012), for its position, Justice Scalia's interpretation of the meaning of "ambiguity" for purposes of *Auer*

---

[17] Chief Justice Roberts gave no reason to believe he disagreed with the other Justices' understanding that "ambiguity" for purposes of *Auer* deference includes vagueness.

[18] Plainly, Justice Gorsuch is not a fan of the *Auer* deference concept.  But the Concurrence's lengthy quotations of Justice Gorsuch's criticisms of that concept do not rebut that Justice Gorsuch used the word "vague" as a synonym for "ambiguous" when he discussed his dislikes of the *Auer* deference framework and that he clearly understood post-*Kisor Auer* ambiguity to include regulations found vague after all the statutory-construction tools are employed.  *See* Concurrence at 71-73.  Indeed, one of the points of Justice Gorsuch's separate concurrence is that when post-*Kisor Auer* deference applies, it allows agencies to interpret their own vague regulations without going through the rulemaking process.

deference also included regulations that remain "vague" or "imprecise" even after the courts use all tools of construction to construe their meaning. Notably, *Kisor* does not cite *Reading Law*. And Justice Scalia, the author of the treatise, in Supreme Court concurrences he wrote both before and after the cited source was published (and after Justice Scalia issued his dissent in *Pauley v. BethEnergy Mine, Inc.*, 501 U.S. 680, 707 (Scalia, J., dissenting)), described *Auer* as permitting deference "when an agency promulgates an *imprecise* rule" or "*vague* rules"—the very types of rules the Concurrence contends are not "ambiguous" for purposes of *Auer*. *TalkAmerica, Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 68-69 (2011) (Scalia, J., concurring) (emphasis added); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 111 (Scalia, J., concurring) (criticizing *Auer* doctrine as allowing deference to agency interpretations of their own rules that they wrote "broadly and vaguely, leaving plenty of gaps to be filled in later"). These statements reflect that Justice Scalia viewed as "ambiguous" for purposes of *Auer* deference "broad[]," "vague," or "imprecise" rules.

Nor, contrary to the Concurrence's contention, does Justice Scalia's *Pauley* dissent offer any support for the Concurrence's argument that regulations that are still vague even after the court uses all its interpretive tools cannot be ambiguous for *Auer* purposes. In *Pauley*, Justice Scalia concluded instead that the mere complexity of the regulation at issue—which pertained to black-lung claims by

36

miners and was lengthy and intertwined with other regulations—did not render it ambiguous. *See id.*

Fourth, we agree that academic journals have observed that *Kisor* requires the courts at step one of *Auer* to exhaust every tool in their interpretive toolbox before declaring a regulation ambiguous. But again, that is quite a different thing from saying that *Kisor* held that a regulation that remains vague, even after using every interpretive tool, cannot be ambiguous for purposes of *Auer* deference. Conspicuously absent from the Concurrence's discussion of academic articles on *Kisor* is any quotation from one that says *Kisor* stands for the proposition the Concurrence says it does.

And finally, the Concurrence's interpretation of the word "ambiguous" would defeat the purpose of *Auer* deference to, among other things, promote "certainty and predictability [in] the administrative process." *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, n.17 (citation and internal quotation marks omitted). For example, here, if each court endowed the ambiguous aspects of the dual-jobs regulation with its own understanding of the precise meaning of the regulation, employers would have no way of knowing without litigation how much of their waiters' time could be spent on related duties before the employers were ineligible for the tip credit. And they would not be able to accurately predict whether some duties were "related."

37

For all these reasons, the Concurrence's view that *Kisor* held that a regulation that is still vague even after the court employs every tool of construction cannot proceed to the second step of the *Auer* deference framework is baseless.

### B. *The 2018 Opinion Letter is not a reasonable interpretation of the dual-jobs regulation*

So we turn to the second step of the *Auer* analysis and consider whether the 2018 Opinion Letter's interpretation of the dual-jobs regulation is a reasonable one. We conclude it is not.

For starters, the 2018 Opinion Letter states, "We do not intend to place a limitation on the amount of duties related to a tip-producing occupation that may be performed, so long as they are performed contemporaneously with direct customer-service duties and all other requirements of the Act are met." U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. FLSA2018-27 (Nov. 8, 2018). The removal of any limit on the time a tipped employee may perform non-tipped duties flatly contradicts the dual-jobs regulation's ceiling on related duties at "occasional[]"— or infrequent. *See Marsh*, 905 F.3d at 625 ("Had the DOL intended to unambiguously foreclose servers from being dual job employees regardless of the amount of time they spend on related, but untipped duties, the regulation would not include the temporal limitations it does."); *see also Fast*, 638 F.3d at 879 ("By using the terms 'part of [the] time' and 'occasionally,' the regulation clearly places

a temporal limit on the amount of related duties an employee can perform and still be considered to be engaged in the tip-producing occupation.").

The 2018 Opinion Letter's use of O*NET to define what duties are sufficiently related creates additional problems. As part of the process by which O*NET determines which duties are core or supplemental for a tip-producing occupation, O*NET asks employees what duties their employers are requiring them to perform. *See* https://www.onetcenter.org/dataCollection.html (last visited Sept. 15, 2021).

But this creates a risk that unlawful practices will become entrenched in high-violation industries by setting up a fox-guarding-the-henhouse situation: simply by requiring tipped employees to perform untipped duties—whether those duties are, in fact, related or not to their tipped duties—employers effectively render the untipped duties "related." *See* 86 Fed. Reg. 22597, 2021 WL 1664281, (Apr. 29, 2021) (recognizing this concern and stating that it was one of the "significant comment[s]" it received that led it to delay implementation of the December 2020 Final Rule); *see also* 86 Fed. Reg. 32818-01, 32826 (noting that O*NET "may reflect" as related duties the work of a non-tipped occupation, simply because "employers require tipped employees to perform [this work]" and emphasizing that O*NET "was not created to identify employer's [sic] legal obligations under the FLSA"). Notably, even when the Department was promoting

the 2018 interpretation, it stopped short of using O*NET to definitively determine "related duties." *See* 85 Fed. Reg. 86756, 86767, 2020 WL 7753223 (Dec. 30, 2020) (stating that the final rule "complements the examples already in § 531.56(e) by adopting [O*NET] *as a source of guidance* for determining when a tipped employee's non-tipped duties are related to his or her occupation" (emphasis added)).

The 2018 Opinion Letter essentially rewrites the dual-jobs regulation to impose obstacles to achieving its original purpose, without undertaking the rulemaking process the Administrative Procedure Act requires. So the 2018 Opinion Letter's construction of the dual-jobs regulation does not fall within "the zone of ambiguity" we have identified in that regulation. Put simply, that is not a reasonable interpretation. And that's enough of a reason not to defer to the 2018 Opinion Letter.

C. *The character and context of the 2018 Opinion Letter's interpretation do not entitle it to controlling weight*

But the 2018 Letter also fails *Auer*'s third prong because the character and context of the Letter's interpretation of the dual-jobs regulation do not entitle it to controlling weight. *See* 139 S. Ct. at 2416. Although *Kisor* cautioned that this step "would not reduce to any exhaustive test," it laid out some "especially important markers for determining when *Auer* deference is and is not appropriate." *Id.* These require us to consider whether the regulatory interpretation is one the agency

40

"actually made," whether the agency's interpretation implicates its substantive expertise, and whether the agency's reading reflects its "fair and considered judgment." *Id.* at 2416-17 (citation and quotation marks omitted).

The parties do not dispute that the 2018 Opinion Letter was the agency's official position at the time it was issued. And the letter does at least theoretically implicate the Department's substantive expertise, since its subject matters— whether an employee's duties are "related" and how long a tipped employee can work on untipped related duties before her employer cannot claim the tip credit for her untipped duties—fall within the scope of the Department's ordinary authority. *See id*. at 2417. But we cannot conclude that the 2018 Opinion Letter represents the agency's "fair and considered" judgment.

*First*, the Department appears to have simply reprinted a stance it previously adopted and then abandoned shortly after adopting it. As we have noted, the 2018 Opinion Letter just reissued the 2009 Opinion Letter verbatim, which itself was issued on the final day of the then-existing administration. The Department withdrew the 2009 Letter less than two months later and returned to defending the twenty-percent rule in the Eighth, Ninth, and Tenth Circuits. *See Fast*, 638 F.3d 872 (8th Cir. 2011); *Marsh*, 905 F.3d 610 (9th Cir. 2018); *Romero*, 849 F.3d 1281 (10th Cir. 2017).

41

*Second*, even the Department's NPRM, issued with the benefit of an additional eleven months after the 2018 Letter, betrays an absence of "fair and considered" judgment on the part of the Department. As the NPRM concedes, the Department "lack[ed] any data to quantify any potential costs, benefits, or transfers which may be associated with the implementation of [its 2018 Opinion Letter] policy." 84 Fed. Reg. 53956-01, at 59367. But the Department "has an obligation to perform its responsibilities with some degree of expertise." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 115 (1976). Here, the Department simply hypothesized.

And worse yet, under its hypothesis, the 2018 policy tramples the reasons for the dual-jobs regulation's existence and is inconsistent with the FLSA's policy of promoting fair conditions for workers. *See* 29 U.S.C. § 202. As the Department itself explained in its 2019 NPRM seeking to turn the 2018 policy into a rule, it anticipated that the new policy could "result in tipped workers such as wait staff and bartenders performing more . . . non-tipped duties," and it could cause "tipped workers [to] lose tipped income by spending more of their time performing duties where they are not earning tips, while still receiving cash wages of less than minimum wage." *Id.* at 53972.

And the 2019 Department was not alone in these predictions. When the Department issued its 2021 Partial Withdrawal and notice of proposed rulemaking on the dual-jobs regulation, it emphasized its belief "that the 2020 Tip final rule . .

42

. could harm tipped employees and non-tipped employees in industries that employ significant numbers of tipped workers." Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 32818, 32820, 2021 WL 2551107 (June 23, 2021); *see also id.* at 32825 ("[T]he Department is concerned that the lack of clear guidelines in the 2020 Tip final rule . . . created the potential for abuse of the tip credit to the detriment of low-wage tipped workers.").

Commenters agreed. *Id.* at 32824 (noting that commenters on the 2020 rule expressed concern that "the new test for when an employer can take a tip credit for related, non-tipped duties will encourage employers to shift more non-tipped work to tipped employees, depressing tipped employees' wages and possibly eliminating non-tipped jobs"), 32826 (noting that commenters on the 2020 rule expressed concern that it would cause employers to shift non-tipped work to tipped employees, "driv[ing] down wages for—or even eliminat[ing] back-of-house positions in restaurants, and related maintenance and prep jobs in other workplaces like hotels, carwashes and parking lots, and service establishments") (citation and quotation marks omitted).

The Department has noted that these concerns of harm are "particularly acute during the COVID-19 pandemic, when . . . many restaurants may have shifted a significant portion of their tipped employees to perform more non-tipped

43

work."   Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 32818, 32826, 2021 WL 2551107 (June 23, 2021).

*Third*, the 2018 Opinion Letter's interpretation of the regulation contradicts the Department's long-standing prior interpretation.  And the Supreme Court has "only rarely given *Auer* deference to an agency construction conflicting with a prior one."  *Kisor*, 139 S. Ct. at 2418 (cleaned up).  Particularly in view of the Department's apparent failure to conduct any real study or analysis before changing its longtime construction of the dual-jobs regulation, we do not think this case qualifies for that rare exception.

*Fourth*, deferring to the letter and applying its interpretation of the dual-jobs regulation to Rafferty's claims would unfairly surprise regulated parties.  *See Kisor*, 139 S. Ct. 2418.  Denny's argues that is not the case with respect to Rafferty because the Department intended the 2018 Letter to be applied retroactively and because the Department issued it before Rafferty filed her complaint.  We are not persuaded.

To be sure, we have upheld an agency's retroactive interpretation before. *See Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257 (11th Cir. 2002). But there, the new interpretation merely clarified existing law; it did not represent an altogether new rule or regulation.  *See id*. at 1260.  As we have explained,

though, we cannot fairly characterize the 2018 Opinion Letter as a clarification of existing law, since it conflicts with that.

As for the fact that the Department issued its 2018 Opinion Letter before Rafferty filed her complaint, that is irrelevant here because the Department's longtime interpretation of the dual-jobs regulation was fully in force throughout the period when Rafferty worked for Denny's. And it is Rafferty's expectations at that time that matter.

For these reasons, we conclude that the 2018 Opinion Letter is not entitled to *Auer* deference.

### D. *The 2018 Opinion Letter is not entitled to* Skidmore *deference*

We also decline to accord *Skidmore* deference to the 2018 Opinion Letter. *See Kisor*, 139 S. Ct. 2424-25 (Roberts, C.J., concurring) (recognizing that while *Auer* and *Skidmore* deference are different, "the cases in which *Auer* deference is warranted largely overlap with the cases in which it would be unreasonable for a court not to [grant *Skidmore* deference]."). *Skidmore* deference refers to "a measure of deference [to the agency] proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher*, 567 U.S. at 159 (cleaned up). As the *Auer* analysis shows, the 2018 Opinion Letter fails this evaluation on all fronts.

45

> *iii.    When we employ the traditional tools of interpretation to determine the meaning of the dual-jobs regulation, we conclude that the regulation prohibits employers from taking the tip credit for hours when an employee performed unrelated duties or performed related duties for more than twenty percent of her time*

Because we conclude that the 2018 Opinion Letter is not entitled to deference, we must evaluate for ourselves the meaning of the dual-jobs regulation as it relates to the non-tipped time and related-duties issues. To do so, we "employ traditional tools of interpretation." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012). But as we have noted, the FLSA is ambiguous on the questions we must resolve here. So we use those tools to discern the most reasonable interpretation we can.

We begin with the text of the FLSA. Although the statute does not answer our precise questions, it does provide some helpful hints. The FLSA's definition of "tipped employee" requires that a qualifying employee be "engaged in an *occupation* in which he *customarily* and *regularly* receives . . . tips." 29 U.S.C. § 203(t). The plain language of this definition tells us that for the employer to qualify to take the tip credit, the employee's job must, by tradition and in reality, be one where she consistently earns tips.

And 29 U.S.C. § 203(m) authorizes employers to pay their tipped employees substantially less than the minimum wage, with the expectation that the employees' tips will at least make up the difference. So to be certain workers

46

receive at least a minimum wage without having to regularly seek the employer's payment of wages to make up for low tips, we must construe the dual-jobs regulation to ensure that the reduced direct wage for tipped employees is available to employers only when employees are actually engaged in a tipped occupation that will allow them to earn the remainder of at least the minimum wage. This is especially so when we recall again that Congress enacted the FLSA in part to ensure workers receive at least a minimum wage. *Schumann*, 803 F.3d at 1207. So any interpretation of the dual-jobs regulation must, of course, likewise guarantee at least a minimum wage.

The language of the dual-jobs regulation also provides clues.

As we have discussed, it explains that an employee can simultaneously be employed as a tipped employee and as a non-tipped employee if she works in two different occupations. And we know from the FLSA that the employer may take the tip credit only when the employee is employed in a tipped occupation. *See* 29 U.S.C. § 203. So reading the dual-jobs regulation in conjunction with the FLSA requires the conclusion that an employer may not take the tip credit for any time that it requires the employee to engage in duties that are not part of the tipped occupation.

By using the term "occasionally," the dual-jobs regulation also informs us that a tipped employee may perform nontipped duties that are a part of her tipped

47

occupation only "from time to time[;] [n]ot habitual[ly]; infrequent[ly]." Occasional, *The American Heritage Dictionary*, at 1215 (4th ed.). And the word "substantial," which quantifies how much time spent on related untipped duties is too much time, means "considerable in quantity." https://www.merriam-webster.com/dictionary/substantial (last visited Sept. 15, 2021). We conclude that a twenty-percent limit on the hours in which a tipped employee may perform untipped related tasks best complies with the temporal limits the regulation places on such duties. This is so for three reasons.

First, while the term "infrequently" does not have a precise meaning, twenty percent of the time aligns with its general meaning. So it is consistent with the dual-jobs regulation's ordinary meaning. *See Fast*, 638 F.3d at 881.

Second, as other courts have observed, the Department often invokes a twenty-percent threshold in distinguishing between substantial and nonsubstantial work in different contexts within the FLSA. *See id.* (citing 29 U.S.C. §§ 213(a)(12), 207(k), 214(a)(15); 29 C.F.R. §§ 783.37, 553.212(a), 552.6); *Marsh*, 905 F.3d at 629 (citing 29 U.S.C. § 213(c)(6)(G), 29 C.F.R. §§ 552.5, 552.6(b), 786.150, 786.1, 786.100, 786.200). In this way, within the context of the FLSA, a line between substantial and occasional work has come to be understood as 20 percent. And as we have noted, the Eighth and Ninth Circuits have previously

48

concluded that a twenty-percent limitation reasonably construes the dual-jobs regulation. *See Fast*, 638 F.3d at 879-81; *Marsh*, 905 F.3d at 623.

Third, twenty percent is consistent with thirty years of DOL interpretation of the dual-jobs regulation—through administrations of both political parties. And here, that means something. After all, the DOL has expertise in the subject matter that the dual-jobs regulation regulates, and in the 2021 NPRM, the Department noted and demonstrated that it had arrived at its 2021 proposed rule—which in part includes a twenty-percent limit on untipped, related duties—through applying its expertise by quantifying costs, analyzing transfers, and qualitatively discussing benefits. *See* 86 Fed. Reg. 32818, at 32832-32843 (discussing the Department's findings).

Finally, we note that through examples, the dual-jobs regulation provides some guidance concerning the types of nontipped duties that are part of the tipped occupation (related duties) and the kinds that are not (unrelated duties). So we know, for instance, that typical maintenance duties are not related to a server's duties. On the other hand, setting tables, toasting bread, making coffee, and occasionally washing dishes or glasses are, even though they do not directly produce tips. But to avoid a prohibited construction of the regulation that embraces unrelated duties of the separate occupations of chef and dishwasher, respectively, we understand all of these illustrations of duties related to a server's

49

occupation to have to do with single-step, easily executed food and drink preparations or readying serving items, such as silverware, plates, and dishes for customers' immediate use. Both categories of tasks directly support a server's serving duties.

We therefore draw from this observation that the dividing line between related and unrelated duties falls where untipped duties no longer directly support tipped duties. This interpretation not only comports with the dual-jobs regulation's content, it is also consistent with the purpose of the dual-jobs regulation and the tipped-employee provision it pertains to: ensuring that employers take the tip credit for only those hours a tipped employee works in a tipped occupation, thereby avoiding circumvention of the minimum wage.

**3.**

a.   Material issues of fact remain concerning Rafferty's dual-jobs claims

Denny's contends that it is entitled summary judgment on Counts Two and Three, the related-duties and non-tipped time issues, even if we don't rely on the 2018 Opinion Letter to interpret the dual-jobs regulation. We disagree.

> i.   *Material issues of fact exist about whether Rafferty engaged in work that did not directly support her tipped occupation while being paid as a tipped employee*

We conclude that a genuine dispute of material fact exists as to whether Rafferty performed any work that is unrelated to her tipped occupation as a server.

50

Rafferty filed a sworn declaration in which she attested she performed myriad duties that were unrelated to her server job. *See Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1300-01 (11th Cir. 2015) (holding that the district court erred by granting summary judgment where nonmovant offered declarations that created genuine dispute of material fact, the declarations were not contradicted by clear testimony, and the district court never ruled on admissibility of declarations before granting summary judgment); *see also Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1303 n.2 (11th Cir. 2016) ("Nevertheless, [sworn] declarations are afforded the same legal weight as affidavits, and are treated accordingly.") (citing 28 U.S.C. § 1746).

Among these were wiping down microwave and stoves; washing and scrubbing walls; cleaning and scrubbing refrigerators, sinks, trays, and bins; and detail cleaning the expediter line. These duties plainly do not qualify as work that directly supports tip-producing work. So to the extent that a jury might find that she engaged in these tasks while Denny's took the tip credit for her hours, Rafferty identified a material issue of fact that precludes summary judgment on Count Two, her related-duties claim.

       2.      *Material issues of fact exist concerning whether Rafferty spent more than twenty percent of her time performing non-tipped, related duties while she was paid as a tipped employee*

As for Rafferty's claim that she performed related duties more than twenty percent of the time, Denny's argues that the district court correctly granted summary judgment because Rafferty cannot identify the particular work week or weeks in which she spent more than twenty percent of her time performing non-tipped duties that were related to her tipped occupation. We disagree.

To establish a claim for a violation under the FLSA, Rafferty must show only that she performed work for which she was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947; *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007). Because of "the remedial nature of [the FLSA] and the great public policy which it embodies," courts are careful to construe the statute so as not to create impossible hurdles for employees. *Allen*, 495 F.3d at 1315 (cleaned up).

Towards that end, we have emphasized that it is the duty of the employer—not the employee—to keep track of the employee's "wages, hours, and other conditions of employment." *Id.* That is so because the employer enjoys a better position to be aware of and create records of the most probative facts about the nature and amount of work performed. *Id.* And denying a claim simply because

the employee cannot produce records of her time worked would reward an employer's failure to comply with its statutory duty to maintain proper records. *Id.*

So though an employee does not have documentation of the precise number of hours she worked and how she spent those hours, she nonetheless satisfies her burden if she "proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 382 U.S. at 687. The burden then shifts to the employer to produce either evidence of the specific amount of work the employee performed or evidence that tends to refute the reasonableness of the inference the employee seeks for the factfinder to draw from her evidence. *Allen*, 495 F.3d at 1316. If the employer does not satisfy this production burden, the court may award damages to the employee, even if the award represents an estimation. *Id.* Though *Allen* was an overtime case, not a dual-jobs case, the principle remains the same here.

Here, Rafferty testified and met her burden in the very portion of her deposition that Denny's cites to say otherwise. When asked if she could provide evidence to a jury that she worked a certain number of hours in a particular workweek, Rafferty testified,

> A. I mean, I guess I really don't know exactly on any particular weeks. Anything near holidays, anything that was busy, there was more time spent doing more cleaning and more sidework typically at the end of the

53

shift on any busier weeks that I had worked at any point in time.

Q. But you can't identify any particular weeks, sitting here today, correct?

A. Correct.

Q. Do you know the percentage of time that you spent doing sidework during any particular week?

A. Probably about between 30 and 50 percent of the time.[19]

Rafferty also went through the particular so-called sidework responsibilities she had and identified how much time each duty took. She explained she was generally assigned ten sidework duties per shift, and for instance, a single one of those duties might include cleaning all blenders and blender lids, restocking and cleaning the hot-fudge warmer, and scrubbing the sink and water spots, thoroughly removing all stains—a group of chores that took her 25 to 30 minutes to complete.[20] And she attested that when she worked with only two other servers, she spent about an hour and a half performing sidework out of the two or three hours total she worked. This is fairly specific testimony concerning the amount of sidework Rafferty performed, and it satisfies Rafferty's burden to establish that she worked more than twenty percent of her time doing untipped related duties.

---

[19] In the same way, though Denny's asserts that Rafferty testified that she was "not sure if there's any particular week [she] spent more than 20 percent of [her] time doing sidework," viewed in context, this testimony again refers to the fact that Rafferty could not identify any specific weeks where that happened.

[20] Because the parties have referred to sidework as related duties, we assume for purposes of our analysis and without regard to the Department's guidance interpreting the dual-jobs regulation that all so-called sidework tasks constitute duties directly supporting tipped work.

54

Indeed, we have recognized that evidence of "triggering factors" for identifying weeks when violations may have occurred—like the busy holiday weeks and shorter shifts Rafferty described—can enable a plaintiff "to show the amount and extent of [her underpaid time] as a matter of just and reasonable inference." *Allen*, 495 F.3d at 1317.

Thus, that Rafferty could not pinpoint the particular weeks where her related duties exceeded twenty percent of the hours she worked does not somehow automatically absolve Denny's of any alleged violations in paying Rafferty as a tipped employee when she spent more than twenty percent of her time performing untipped duties. Rather, Denny's must come forward with evidence to negate the inferences from Rafferty's testimony that she worked more than twenty percent of her time in related duties at least some of the time she was employed by Denny's.

Because the record contains material issues of fact concerning whether Denny's required Rafferty to work more than twenty percent of her time on untipped related duties, summary judgment was not appropriate on Count Three.

**B.    The district court properly granted summary judgment on Rafferty's tip-credit notification claim (Count One)**

The FLSA requires employers to provide notice to their employees relating to their status as tipped employees and the significance of that status:

> "The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been

55

informed by the employer of the provisions of this subsection . . . ."

29 U.S.C. § 203(m)(2)(A).  Over the years, the Department has issued regulations to clarify exactly what this language requires.  Here, Rafferty asserts that Count One presses claims that the Department failed to comply with the requirements of 29 C.F.R. § 531.59(b) and 516.28(a)(3).  We review each liability theory in turn.

### 1.    *The district court correctly granted summary judgment to Denny's on Rafferty's notice claim under 29 C.F.R. § 531.59*

The first regulation at issue, 29 C.F.R. § 531.59, requires an employer to provide an employee with certain information before the employer may take advantage of the tip credit.  It provides in relevant part,

> Pursuant to section 3(m)(2)(A), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m)(2)(A) of the Act, *i.e.*: The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a tip pooling arrangement limited to employees who customarily and regularly receive tips; **and that the tip credit shall not apply to any employee who has not been informed of the requirements in this section.**

29 C.F.R. § 531.59(b) (emphasis added).  By its terms, this regulation requires the employer to inform the employee of five things:

(1) the amount of cash wage the employer is paying a tipped employee, which must be at least $2.13 per hour;

(2) the additional amount claimed by the employer as a tip credit, which cannot exceed $5.12 (the difference between the minimum required cash wage of $2.13 and the current minimum wage of $7.25);

(3) that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the tipped employee;

(4) that all tips received by the tipped employee are to be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and

(5) that the tip credit will not apply to any tipped employee unless the employee has been informed of these tip credit provisions.

Department of Labor, Wage and Hour Division, Fact Sheet #15. Only the fifth provision is at issue here: that the tip credit will not apply to any tipped employee unless the employer advised the employee of all five pieces of information that the regulation requires.[21]

Denny's argues that Rafferty waived any claim for relief for a violation of 29 C.F.R. § 531.59 by failing to raise it in her complaint. Specifically, Denny's

---

[21] Before the Department issued 29 C.F.R. § 531.59 in 2011, there was some dispute about whether 29 U.S.C. § 203(m)(2)(A) required the fifth item that the regulation identifies. *See Schaefer v. Walker Bros. Enterprises, Inc.*, 829 F.3d 551, 556 (7th Cir. 2016) (holding that conveying this information was not required by the statute itself, and that 29 C.F.R. § 531.59 did not govern conduct before its issuance in 2011). But the regulation makes this explicit, and Denny's does not dispute that the regulation applies to Rafferty's claims.

57

claims that because Rafferty failed to plead violations of the fifth requirement, she has waived that claim. We disagree.

Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).

In paragraph 5 of her complaint, Rafferty alleged, "Defendant violated the FLSA by paying servers sub-minimum, tip-credit wages without informing them of the tip-credit provisions of the FLSA." Rafferty later identified the notice requirement again, citing 29 U.S.C. § 203(m) and 29 C.F.R. § 531.59(b), and she averred, "The prerequisites to taking a tip credit from the wages of an employee, which are set forth in 29 U.S.C. § 203(m) and 29 C.F.R. § 531.59(b), state . . . that the tip credit shall not apply to any employee who has not been informed of these requirements in this section."

As we have explained, Rule 8 requires only that the defendant be given notice as to the claim being asserted and its grounds. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). These allegations sufficiently fulfilled that function.

With that out of the way, we now turn to the merits of the claim. We agree with the district court that summary judgment on this claim was appropriate. Denny's filed the affidavit of Amber Demattio, the restaurant manager who trained

58

Rafferty on her first day at Denny's, in support of its motion for summary judgment. In that affidavit, Demattio attested that she advised Rafferty that "only those who received the tip credit information would be paid on a tip credit basis—specifically, that only servers (and not other job codes like hostess, cook, etc.) were paid on a tip credit and that all servers received the same information about how the tip credit process worked during their orientation and onboarding." This statement satisfies the fifth requirement from the regulation, that the employer tell the employee "that the tip credit will not apply to any tipped employee unless the employee has been informed of these tip credit provisions." 29 C.F.R. § 531.59(b)(5).

Rafferty presented no evidence to contradict Demattio's statement. Though she alleges that Denny's admission that it did not include the fifth requirement in any written materials before 2019 undermines Demattio's statement, we find no conflict. Demattio did not say she gave Rafferty written materials informing of the fifth requirement; she attested she verbally advised Rafferty of it.

So the district court correctly determined that no genuine dispute of material fact existed and that Denny's was entitled to judgment on the tip-credit notification claim under 29 U.S.C. § 203(m) and 29 C.F.R. § 531.59(b) as a matter of law.

## 2.    *Rafferty did not assert a claim under 29 C.F.R. § 516.28*

Rafferty also contends she stated a claim under 29 C.F.R. § 516.28.  That regulation provides,

> (a) With respect to each tipped employee whose wages are determined pursuant to section 3(m) of the Act, the employer shall maintain and preserve payroll or other records containing all the information and data required in § 516.2(a) and, in addition, the following:
>
> . . .
>
> (3) Amount by which the wages of each tipped employee have been deemed to be increased by tips as determined by the employer (not in excess of the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of the Act). The amount per hour which the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week.

29 C.F.R. § 516.28(a)(3).  Rafferty asserts that Denny's violated this regulation by failing to provide updated information about the amount of the tip credit it was taking each time that the Ohio minimum wage rate (and thus the amount that Denny's was claiming as a tip credit) changed during Rafferty's employment.

Denny's responds that Rafferty waived this theory of relief because she did not raise it in her complaint.  This time we agree with Denny's.

A defendant is not required to infer all possible claims that could arise out of the facts set forth in the complaint.  *Gilmour*, 382 F.3d at 1315.  And plaintiffs may

60

not "raise new claims at the summary judgment stage." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188 (11th Cir. 2015).

Unlike with the other theory contained in Count One, Rafferty did not so much as mention 29 C.F.R. § 516.28(a)(3) at all in her complaint, let alone in Count One. We can discern no grounds on which Denny's could have been expected to understand that Rafferty was alleging a cause of action based on Denny's failure to update the tip credit notice every year. *See White*, 789 F.3d at 1200 (stating that there was no basis for defendant to conclude that plaintiff was alleging employer-notice cause of action under FLSA where complaint contained no mention of lack of notice).

Because Rafferty failed to sufficiently plead violations of 29 C.F.R. § 516.28(a)(3), we conclude the district court correctly declined to consider this theory and granted summary judgment to Denny's on Count One.[22]

## IV.

For the reasons we have explained, we affirm the district court's entry of summary judgment on Count One, and we reverse its entry of summary judgment

---

[22] Rafferty also argues that the district court erred in treating her allegations that Denny's violated 29 C.F.R. § 516.28(a)(3) as a claim that is separate from her claim that Denny's violated 29 U.S.C. § 203(m)'s notice provision. While we agree that a violation of 29 C.F.R. § 516.28(a)(3) ultimately constitutes a violation of 29 U.S.C. § 203(m), that fact does not relieve a plaintiff of the obligation to put the defendant on notice of the ways in which the plaintiff alleges the defendant violated the statute. As we have explained, Rafferty failed to do that with respect to her theory as it pertains to Denny's alleged violation of 29 C.F.R. § 516.28(a)(3), so the district court correctly granted summary judgment on Rafferty's notice violation under 29 U.S.C. § 203(m) and 29 C.F.R. § 531.59(b).

on Counts Two and Three.  We remand the case for further proceedings consistent with this opinion.

**AFFIRMED  IN  PART;  REVERSED  AND  REMANDED  IN  PART.**

LUCK, Circuit Judge, concurring in the result:

The majority opinion reverses summary judgment for Denny's, Inc. because the district court erred in giving <u>Auer v. Robbins</u>, 519 U.S. 452 (1997) deference to the Department of Labor's 2018 Opinion Letter interpreting the dual jobs regulation, 29 C.F.R. § 531.56(e). The majority opinion explains that the 2018 Opinion Letter should not get <u>Auer</u> deference because, although the dual jobs regulation is genuinely ambiguous, the 2018 Opinion Letter is not a reasonable reading of the regulation and the Letter's character and context are not worthy of controlling weight. I agree that the district court erred in giving <u>Auer</u> deference to the 2018 Opinion Letter, but I think it erred because the dual jobs regulation is not genuinely ambiguous. Like the majority opinion, I would reverse and remand, but I would reverse and remand for the district court to apply the unambiguous text of the dual jobs regulation instead of the Department of Labor's opinion letters purporting to interpret the regulation.

*    *    *    *

The Fair Labor Standards Act requires an employer to pay a non-exempt employee no less than the federal minimum wage, 29 U.S.C. § 206(a), but an employer can, in certain circumstances, take a tip credit and pay a tipped employee less than the minimum wage, <u>id.</u> § 203(m)(2)(A). A "tipped employee" means

63

"any employee engaged in an occupation in which [s]he customarily and regularly receives more than $30 a month in tips." Id. § 203(t). An employer can only take a tip credit where the amount of tips the employee receives is at least equal to the difference between the federal minimum wage and the tip credit wage. Id. § 203(m)(2)(A)(ii). Thus, the employee's tip credit wage, coupled with the tips she receives, ensures that her hourly wage at least equals the federal minimum wage.

To implement the Act's tip credit provision, the department issued the dual jobs regulation, 29 C.F.R. § 531.56. This regulation provides:

> (e) Dual jobs. In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

29 C.F.R. § 531.56(e). Rafferty's complaint alleged that Denny's violated the dual jobs regulation in two ways. In count two, she said that Denny's made her perform non-tipped labor "unrelated" to her tipped occupation while paying her the tip

credit wage.    And in count three, Rafferty maintained that Denny's made her perform non-tipped labor "related" to her tipped occupation more than "part of the time" (or for an "unreasonable" amount of time).

In 2018, the department made two major changes to its interpretation of the dual jobs regulation.  See U.S. Dep't Labor, Wage & Hour Div., Op. Ltr. FLSA-2018-27, 2018 WL 5921455 (Nov. 8, 2018).  First, the department disclaimed any "limitation on the amount of duties related to a tip-producing occupation that may be performed," provided that these related duties "are performed contemporaneously with direct customer-service duties[.]"  Id. at *3.  Second, the department said that employers should rely on the "Occupational Information Network" ("O*NET") to determine whether a specific task is "directly related to the tip-producing duties" of an occupation.  Id.

The question for us is whether the district court erred by giving Auer deference to the 2018 Opinion Letter.  In Kisor v. Wilkie, 139 S. Ct. 2400 (2019), the Supreme Court clarified when a court should—and shouldn't—give Auer deference to an agency's interpretation of one of its regulations.  Deference is appropriate only where:  (1) the regulation is "genuinely ambiguous"; (2) the agency's interpretation of its ambiguous regulation is "reasonable"; and (3) a court's "independent inquiry" into the "character and context of the agency interpretation" shows that it's entitled to "controlling weight."  Id. at 2414–16.

65

The traditional "canons of construction" apply to regulations just like they apply to statutes. Cremeens v. City of Montgomery, 602 F.3d 1224, 1227 (11th Cir. 2010). Although there was "a time when a court faced with a regulation that seemed 'impenetrable on first read' might simply 'wave the ambiguity flag' and defer to the agency's interpretation," those days are over. See United States v. US Stem Cell Clinic, LLC, 998 F.3d 1302, 1308 (11th Cir. 2021) (quoting Kisor, 139 S. Ct. at 2415). "Before declaring a regulation genuinely ambiguous, we must exhaust all the traditional tools of construction, which entails carefully considering the text, structure, history, and purpose of the regulation." Id. (cleaned up). We can only proceed to the second and third steps of the Auer deference analysis if "our tools of construction" cannot "resolve the apparent ambiguity." Id.

"[A] regulation is not ambiguous merely because 'discerning the only possible interpretation requires a taxing inquiry.'" Kisor, 139 S. Ct. at 2415 (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991) (Scalia, J., dissenting)). We can often show that even "impenetrable" regulations that "make the eyes glaze over" have an unambiguous meaning once we use our "legal toolkit." Id. A regulation is ambiguous if (and only if), after exhausting the tools of construction, it "remains genuinely susceptible to multiple reasonable

66

meanings." Id. at 2419. Not multiple reasonable applications—multiple reasonable meanings.[1]

---

[1] The Kisor Court's definition of ambiguity as "multiple reasonable meanings"—rather than applications—is not some special term-of-art definition. Ambiguity is a legal term and the legal dictionaries define it that way. See, e.g., Ambiguity, A Dictionary of Modern Legal Usage 48 (2d ed. 1995) ("A 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (quotation omitted)). So do the non-legal dictionaries. See, e.g., Ambiguity, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/ambiguity (last visited Sept. 13, 2021) (defining ambiguity as "(an example of) the fact of something having more than one possible meaning and therefore possibly causing confusion" (emphasis added)).

But Kisor is a shift from how the Supreme Court previously applied the Auer deference doctrine. See Daniel Lutfy, Note, Auer 2.0: The Disuniform Application of Auer Deference After Kisor v. Wilkie, 88 Fordham L. Rev. 2011, 2018 (2020) ("This Note addresses, in part, how Kisor's formulation of Auer deference represents a shift from the Court's prior iterations of Auer in Decker." (footnote omitted)); Andrew Schneider & Jonathan Stroud, The Eleventh Auer: The Effect of Kisor v. Wilkie on Rulemaking and Adjudication at the United States Patent and Trademark Office, 19 Chi.-Kent J. Intell. Prop. 485, 504 (2020) ("Kisor may seem like small potatoes, but it represents a shift in the landscape of administrative law that will be felt for years to come."); Gillian E. Metzger, The Roberts Court and Administrative Law, 2019 Sup. Ct. Rev. 1, 65 (2019) ("One need look no further than the aftermath of Kisor to see this effect. In the four-month period after Kisor's issuance, the courts of appeals directly considered whether to apply Auer deference in light of Kisor in thirty cases and deferred to the agency's approach in only ten of those. In an additional five cases, the court declined deference but ultimately upheld the agency's interpretation, for an overall rate of the government prevailing 50 percent of the time. By comparison, studies of the years leading up to Kisor have identified the courts as granting Auer deference or the government as prevailing 71 percent of the time." (footnotes omitted)).

As the Kisor Court explained, it took the opportunity to "somewhat expand on" its Auer deference doctrine, including its discussion of ambiguity, so the Court could "clear up some mixed messages [it] ha[d] sent" in past cases. 139 S. Ct. at 2414. The Court, not so silently, conceded that its pre-Kisor decisions had "applied Auer deference without significant analysis of the underlying regulation," had "given Auer deference without careful attention to the nature and context of the interpretation," and its "most classic formulation of the test—whether an agency's construction is 'plainly erroneous or inconsistent with the regulation'—may suggest a caricature of the doctrine, in which deference is 'reflexive.'" Id. at 2414–15 (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). As Justice Gorsuch put it, before Kisor, "[t]here [were] innumerable lower court decisions that . . . followed [the Supreme] Court's lead and

This isn't some reinterpretation of three words from <u>Kisor</u>.  This is what <u>Kisor</u> told us to do.  Over and over again, the Supreme Court explained that terms and phrases in a regulation are genuinely ambiguous where their "meaning"—rather than their application—is unclear.  <u>See, e.g.</u>, <u>id.</u> at 2415 (explaining that <u>Auer</u> deference is appropriate only "if the meaning of the words used is in doubt" (quotation omitted)); <u>id.</u> at 2419 ("As we have explained, a court must apply all traditional methods of interpretation to any rule, and must enforce the plain meaning those methods uncover"); <u>id.</u> at 2420 ("[T]he meaning of a legislative rule remains in the hands of courts, even if they sometimes divine that meaning by looking to the agency's interpretation").  Because the focus is on meaning, the Supreme Court remanded for the Federal Circuit to "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the

---

afforded <u>Auer</u> deference mechanically, without conducting the inquiry the [<u>Kisor</u>] Court now holds is required."  <u>Id.</u> at 2447 (Gorsuch, J., concurring in the judgment).

     <u>Kisor</u>, by requiring genuine ambiguity, "cabined <u>Auer</u>'s scope in varied and critical ways" in order to maintain "a strong judicial role in interpreting rules."  <u>Id.</u> at 2418 (majority opinion).  That's why the Supreme Court criticized its own decisions, including <u>Seminole Rock</u>, and why relying on pre-<u>Kisor</u> cases may not be helpful.  And that's why, post-<u>Kisor</u>, our analysis should be refocused on where <u>Kisor</u> told us to focus:  on whether a regulation is genuinely susceptible to multiple reasonable meanings.

     To the extent we are left with a regulation that has an unquestioned meaning, but uncertain application to various factual situations, all is not lost and the courts are not left on their own.  The executive agency, through the Administrative Procedures Act, can clarify the regulation and fix the vagueness problem through the rulemaking process.  That's exactly what the Department of Labor is doing right now with the dual jobs regulation.  But, after <u>Kisor</u>, what the agency cannot do is disregard the Act and the rulemaking process by issuing a letter purporting to interpret an unambiguous regulation without notice and without giving reasoned consideration to the public's comments.

68

regulation" at issue in Kisor "really has more than one reasonable meaning." Id. at 2424.

As Justice Scalia explained, "[a] word or phrase is ambiguous when the question is which of two or more meanings applies; [but] it is vague when its unquestionable meaning has uncertain application to various factual situations." A. Scalia & B. Garner, Reading Law:  The Interpretation of Legal Texts 32 (2012); Ambiguity, A Dictionary of Modern Legal Usage 48–49 (2d ed. 1995) ("Ambiguity should be distinguished from vagueness:  'It is unfortunate that many lawyers persist in using the word ambiguity to include vagueness.  To subsume both concepts under the same name tends to imply that there is no difference between them or that their differences are legally unimportant.  Ambiguity is a disease of language, whereas vagueness, which is sometimes a disease, is often a positive benefit. . . .  Whereas ambiguity refers to equivocation, vagueness refers to the degree to which, independently of equivocation, language is uncertain in its respective applications to a number of particulars. . . .'  Of course, even highly reputed legal writers confuse the two terms . . . ." (quoting R. Dickerson, The Interpretation of Statutes 48–49 (1975)).  In other words, being hard to apply might

make the regulation vague. But it does not make the regulation ambiguous and susceptible to multiple reasonable meanings.[2]

The Kisor Court understood the critical difference between more-than-one-meaning (ambiguity) and uncertain application (vagueness). In cabining the scope of the Auer deference doctrine, Kisor explained that "[f]irst and foremost, a court should not afford Auer deference unless the regulation is genuinely ambiguous." 139 S. Ct. at 2415. Right after the phrase "genuine ambiguity," the Court quoted from Seminole Rock that Auer deference should be afforded "only 'if the meaning of the words used is in doubt.'" Id. (quoting Seminole Rock, 325 U.S. at 414).

_____

[2] Justice Scalia was pretty consistent about focusing the ambiguity question on whether words or phrases have different "meanings" (rather than applications). See, e.g., Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 321 (2014) (Scalia, J.) ("A statutory provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (cleaned up)); United States v. Santos, 553 U.S. 507, 512 (2008) (Scalia, J.) ("Since context gives meaning, we cannot say the money-laundering statute is truly ambiguous until we consider 'proceeds' not in isolation but as it is used in the federal money-laundering statute."); Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 739 (1996) (Scalia, J.) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering."); United States v. Gaudin, 515 U.S. 506, 519 (1995) (Scalia, J.) ("Though uniform postratification practice can shed light upon the meaning of an ambiguous constitutional provision, the practice here is not uniform, and the core meaning of the constitutional guarantees is unambiguous."); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("We think, to the contrary, that the lump-sum appropriation has a well understood meaning, and that the legislative history described above does not give content to an ambiguous enactment but rather reflects the congressional comprehension of a clear one.").

And to the extent Justice Scalia criticized the Supreme Court's earlier decisions giving Auer deference to imprecise and vague regulations, the Kisor Court, in "clear[ing] up" and "expand[ing] on" the Auer deference doctrine, used his approach to ambiguity by requiring "multiple reasonable meanings" and adopted his dissenting opinion in Pauley. See id. at 2414–15, 2419 (quoting Pauley, 501 U.S. at 707 (Scalia, J., dissenting)).

While the Supreme Court homed in on the "meaning of the words used," it didn't mention the words "vague" or "vagueness" in the genuine ambiguity section of the opinion.  See id. (discussing the first step of the Auer deference doctrine).

Vagueness only came up six pages later in section III-A.  After explaining how to apply Auer deference, Justice Kagan responded to the petitioner's argument that "Auer encourages agencies to issue vague and open-ended regulations, confident that they can later impose whatever interpretation of those rules they prefer."  Id. at 2421.  Writing only for a plurality of the Court, Justice Kagan rejected the argument that Auer deference encourages vagueness because "[v]agueness increases the chance of adverse judicial rulings," and "it enables future administrations, with different views, to reinterpret the rules to their own liking."  Id.  Vagueness isn't mentioned in the genuine ambiguity part of Kisor, but instead comes up six pages later in a completely different section of the plurality, because vagueness and ambiguity are different legal concepts.

Justice Gorsuch, in his Kisor opinion concurring in the judgment, also touched on the difference between vagueness and ambiguity.  He discussed vague regulations, not in terms of "meaning," but in terms of "applications."  See id. at 2440 (Gorsuch, J., concurring in the judgment) ("Whether or not regulations are designed to be vague, many can be read in different ways, especially when new and unanticipated applications arise; cases like that come before the courts all the

time." (citation and quotation omitted; emphasis added)).  And Justice Gorsuch talked about ambiguity, not in terms of "applications," but in terms of "meaning." See id. at 2446 (Gorsuch, J., concurring in the judgment)  ("We begin our interpretation of the regulation with its text and, if the text is unclear, we turn to other canons of interpretation and tie-breaking rules to resolve the ambiguity.  And when we interpret an ambiguous statute, we never ask what current members of Congress think it means; in fact, we've held unanimously that legislators' post-enactment views about a statute's meaning are not even a legitimate tool of statutory interpretation.   Affording controlling weight to regulators' post-promulgation views about the meaning of an ambiguous regulation is hard to square with these usual judicial practices." (quotations and footnotes omitted; emphasis added)); see also id. at 2442 (Gorsuch, J., concurring in the judgment) ("Proceeding farther down this doubtful path, Justice Kagan asserts that resolving ambiguities in a regulation sounds more in policy than in law and is thus a task more suited to executive officials than judges.  But this claim, too, contradicts a basic premise of our legal order:  that we are governed not by the shifting whims of politicians and bureaucrats, but by written laws whose meaning is fixed and ascertainable—if not by all members of the public, then at least by lawyers who can advise them and judges who must apply the law to individual cases guided by

72

the neutral principles found in our traditional tools of interpretation.") (emphasis added).

So, after <u>Kisor</u>, how are words and phrases genuinely susceptible to multiple reasonable meanings?  A classic example of genuine ambiguity can be found in the celebrated case of <u>Raffles v. Wichelhaus</u>, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864).  There, the plaintiff agreed to sell to the defendant a cargo of cotton arriving on a ship, the Peerless, sailing from Bombay.  But, remarkably enough, there were two ships named Peerless sailing that year from Bombay, "one in October, the other in December."  O. W. Holmes, <u>The Common Law</u> 309 (1881).  "The plaintiff meant the latter, the defendant the former."  <u>Id.</u>  That's true ambiguity.  The unlikely coincidence of two ships with the same name sailing from Bombay in the same year made it reasonable for the parties to ascribe "two totally different meanings" to the same legal text.  <u>See</u> Scalia & Garner, <u>Reading Law</u>, at 31.

Here's another textbook example of genuine ambiguity:  what does the word "chicken" mean?  That question was hotly contested in <u>Frigaliment Importing Co. v. B.N.S. International Sales Corp.</u>, 190 F. Supp. 116 (S.D.N.Y. 1960), a case about a contract for the sale of chicken.  The buyer, who understood chicken to mean a "young chicken, suitable for broiling and frying," cried foul when the seller delivered older birds meant for stewing.  <u>Id.</u> at 117.  Because it was reasonable for the parties to give a different meaning to the same word, the district court looked to

73

the parties' negotiations, course of performance, and trade usage to resolve the ambiguity. That's what it takes for language to be ambiguous: it must be "genuinely susceptible to multiple reasonable meanings." See Kisor, 139 S. Ct. at 2419.

For the dual jobs regulation, the very first tool in the box—"the plain language of the regulation"—resolves any apparent ambiguity. See Landau v. RoundPoint Mortg. Servicing Corp., 925 F.3d 1365, 1369 (11th Cir. 2019) (explaining that "[w]hen we construe regulations, we begin with the language of the regulation, just as we do for statutes"); Kisor, 139 S. Ct. at 2446 (Gorsuch, J., concurring in the judgment) (explaining that "[w]hen we interpret a regulation, we typically . . . proceed in the same way we would when interpreting any other written law: We begin our interpretation of the regulation with its text" (quotation marks omitted)). The dual jobs regulation says that it's permissible for a tipped employee to "occasionally," or "part of [the] time," perform non-tipped duties "related" to the employee's tipped occupation, even if these related duties aren't "themselves [] directed toward producing tips." 29 C.F.R. § 531.56(e). The regulation's key words—"related" and "occasionally"—have plain and ordinary meanings in this context that we can readily discern.

"Related" means "connected or associated, as by origin or kind." Related, Webster's New World Dictionary 1198 (2d ed. 1970); accord Related, Webster's

74

Seventh New Collegiate Dictionary 723 (1969) (defining "related" as "connected by relation"). When there is a connection or association between two different things, they are related to each other even if they are not identical. That's the ordinary meaning of "related." See Cont'l Cas. Co. v. Wendt, 205 F.3d 1258, 1262–63 (11th Cir. 2000) (affirming the district court's conclusion that the "words 'relate' or 'related'" are unambiguous and "commonly understood terms in everyday usage"). Thus, a duty is "related" to an employee's tipped occupation where there is a connection or association between the duty and the occupation. For example, a cook who washes pots and pans has performed a task "related" to her occupation; there is an obvious link between having clean pots and pans and cooking a customer's meal.[3]

Helpfully, the dual jobs regulation gives us more examples of related and unrelated duties. A hotel employee whose occupation is "maintenance" doesn't perform a "related" duty when she "also serves" as a waitress. See 29 C.F.R. §

_____

[3] Distinctly related, directly related, and indirectly related are different kinds of relatedness. But they do not mean "related." They do not define "related." They are their own separate and unique terms with their own separate and unique meanings. Compare 45 C.F.R. § 153.365 ("If a State is operating a risk adjustment program, it must keep an accounting of all receipts and expenditures related to risk adjustment payments and charges and the administration of risk adjustment-related functions and activities for each benefit year." (emphasis added)), with 45 C.F.R. § 73.735-704(a)(1) ("The work is not to be rendered, with or without compensation, to organizations, institutions, or state or local governments with which the official duties of the employee are directly related, or indirectly related if the indirect relationship is significant enough to cause the existence of conflict or apparent conflict of interest . . . ." (emphasis added)). It's a matter of black letter law, rather than the ivory tower of linguistics, that we must "give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (quotation omitted). When regulations use different words and phrases, they don't mean the same thing; they have different meanings.

531.56(e).  There's no connection between maintenance work, like fixing the plumbing or tiling the floor, and a waitress's work, like taking an order or serving soup.  The regulation also tells us that a waitress does perform a "related" duty when she spends time "cleaning and setting tables," "toasting bread," "making coffee," or "washing dishes or glasses."  Id.  Wiping down tables for the next customers or brewing coffee for them to drink are clearly connected to the waitress's tipped occupation as a server, even if these duties aren't "themselves . . . directed toward producing tips."  Id.

The regulation's other key word—"occasionally"—also has an ordinary meaning.  "Occasionally" means "now and then" or "sometimes."  Occasionally, Webster's New World Dictionary 983 (2d ed. 1970).  Something that happens occasionally doesn't happen "most of the time" or "frequently," but it also doesn't happen "rarely."  In other words, it happens "part of [the] time."  See 29 C.F.R. § 531.56(e).

But "occasionally" doesn't mean ten or twenty percent or any other specific percent.  No dictionary defines it that way and no ordinary person would understand it that way.  If your friend told you that she "occasionally" goes to the mall, you wouldn't think she goes ten percent or twenty percent of the time.  You would know exactly what she meant—your friend goes to the mall every "now and

then."[4]    The friend-at-the-mall is as good an example as any because, when we read the law, the general rule is that words and phrases must be given their ordinary meaning—and not the meaning given years later by some technocrat laboring in the bowels of an agency.  See Gonzales v. Carhart, 550 U.S. 124, 152 (2007) ("In interpreting statutory texts courts use the ordinary meaning of terms unless context requires a different result.").

The ordinary meaning of the dual jobs regulation allows a tipped employee to perform, every "now and then," non-tipped duties related to her tipped occupation.  These related duties can't take up most of the employee's time.  Denny's couldn't make a server spend most of her shift cleaning tables or brewing coffee and then take the tip credit.  But these related duties don't have to be rare events to comply with the regulation.  That's what "occasionally" means.

*    *    *    *

The dual jobs regulation isn't susceptible to two reasonable meanings. Applying this unambiguous regulation to the particular facts of a specific case might prove challenging, but we may not reasonably give the regulation multiple meanings where its plain language allows for only one.

---

[4] A waitress who "occasionally" takes on related duties may be doing the related work for nineteen percent of her shift or twenty-one percent.  "Occasionally" may apply in lots of different circumstances and to lots of different fact patterns.  But the word "occasionally" is not naturally understood or defined as nineteen, twenty, or twenty-one percent of the time.

77

Because the dual jobs regulation isn't genuinely ambiguous, we shouldn't reach the second and third steps of the <u>Auer</u> deference analysis. We should instead remand for the district court to apply the plain meaning of the regulation to Rafferty's claims under section 531.56(e). As to Rafferty's claim in count two, the district court should determine whether there is a genuine dispute that Rafferty performed duties "unrelated"—in other words, "unconnected"—to her tipped occupation as a server. As to Rafferty's claim in count three, the district court should determine whether there is a genuine dispute that Rafferty performed non-tipped duties related to her tipped occupation as a server more than "occasionally" or "part of the time"—in other words, more than "now and then."