[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11681

_____

U.S. DEPARTMENT OF LABOR,

Petitioner,

*versus*

TAMPA ELECTRIC COMPANY,

Respondent.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
Agency No. 17-2144

_____

Before NEWSOM, TJOFLAT, and ED CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

In this case, we must decide whether the Tampa Electric Company violated OSHA's Hazardous Waste Operations and Emergency Response standard when employees at one of its power plants responded to an ammonia release without donning certain protective gear. Because we conclude that the release of ammonia at Tampa Electric's plant wasn't "uncontrolled" within the meaning of the OSHA standard, we hold that the standard didn't apply to Tampa Electric's response and, therefore, that Tampa Electric didn't violate it.

I

The disposition of this petition for review turns on the interpretation and application of OSHA's Hazardous Waste Operations and Emergency Response standard—for short, "HAZWOPER." In relevant part, that standard states that "[e]mployees engaged in *emergency response* and exposed to hazardous substances presenting an inhalation hazard or potential inhalation hazard shall wear positive pressure self-contained breathing apparatus[es] while engaged in *emergency response*." 29 C.F.R. § 1910.120(q)(3)(iv) (emphasis added).

As our italics indicate, the key term here is "emergency response," which the regulation defines in three parts. In particular, the first sentence quoted below explains what *is* an "emergency

response," and the second and third sentences explain what *is not* an "emergency response":

> Emergency response or responding to emergencies means a response effort by employees from outside the immediate release area or by other designated responders (i.e., mutual aid groups, local fire departments, etc.) to an occurrence which results, or is likely to result, in an uncontrolled release of a hazardous substance. Responses to incidental releases of hazardous substances where the substance can be absorbed, neutralized, or otherwise controlled at the time of release by employees in the immediate release area, or by maintenance personnel are not considered to be emergency responses within the scope of this standard. Responses to releases of hazardous substances where there is no potential safety or health hazard (i.e., fire, explosion, or chemical exposure) are not considered to be emergency responses.

29 C.F.R. § 1910.120(a)(3). The determinative question in this case is whether the release of ammonia at Tampa Electric's plant constituted an "uncontrolled release" within the meaning of the definition's first sentence.

On, then, to the facts. Tampa Electric operates a power plant that uses ammonia as part of its power-generation process. The plant receives ammonia through underground pipes that connect to an aboveground apparatus called a "skid," which processes the ammonia into usable form. Tampa Electric's plant is designed

so that if the pipes transporting the ammonia become overpressurized, some of the ammonia is diverted into a "sump," an underground water tank that absorbs and neutralizes the excess. If the sump water becomes saturated with ammonia, and is thus unable to absorb any more, the system will begin to release ammonia into the outside air through a vent in the sump.

In May 2017, one of the underground pipes became overpressurized, and, as it was designed to do, the system automatically diverted ammonia from that pipe to the sump. A short while later, ammonia saturated the sump water, and excess ammonia began venting to the outside. The ammonia in the air triggered a sensor at the skid set to alarm if the ambient ammonia reached 50 parts per million.

About 45 minutes after the ammonia began to vent, a security guard heard the alarm sounding at the skid and smelled ammonia. He began having trouble breathing and reported the leak. Once notified, control-room personnel dispatched "rovers"—specially trained response employees—to manage the ammonia release.

Upon arriving at the skid, the rovers called the control room and instructed those there to "isolate" one of the valves regulating the flow of ammonia. Meanwhile, the rovers continued working on other parts of the skid and added water to the sump. Working together, plant personnel stopped the ammonia release, but because the rovers arrived at the skid without "self-contained

breathing apparatus[es]," OSHA fined Tampa Electric $9,054 under 29 C.F.R. § 1910.120(q)(3)(iv).

Tampa Electric appealed the citation. The Occupational Safety and Health Review Commission held that Tampa Electric's response to the ammonia release wasn't an "emergency response" within the meaning of the HAZWOPER standard and, therefore, that the company hadn't violated that standard. For the reasons explained below, we agree and thus deny OSHA's petition for review.[1]

## II

To establish a prima facie case that an employer violated an OSHA regulation, the agency must show "(1) that the regulation applied; (2) that it was violated; (3) that an employee was exposed to the hazard that was created; and importantly, (4) that the employer 'knowingly disregarded' the Act's requirements." *Quinlan v. Sec'y, U.S. Dep't of Lab.*, 812 F.3d 832, 836 (11th Cir. 2016) (quoting *ComTran Grp., Inc. v. U.S. Dep't of Lab.*, 722 F.3d 1304, 1307

---

[1] We review the Commission's factual findings for "substantial evidence" and its legal determinations for whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Quinlan v. Sec'y, U.S. Dep't of Lab.*, 812 F.3d 832, 836 (11th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A) and *ComTran Grp., Inc. v. U.S. Dep't of Lab.*, 722 F.3d 1304, 1307 (11th Cir. 2013) (holding that the Commission and ALJs are bound to follow the law of the circuit where the case is most likely to be appealed)).

6                    Opinion of the Court                    21-11681

(11th Cir. 2013)).  We begin, and here find we can end, at step one—whether the HAZWOPER standard applied.

We agree with the Commission that Tampa Electric's actions here didn't constitute an "emergency response" within the meaning of 29 C.F.R. § 1910.120(a)(3).[2]  As that provision's first sentence explains, to be considered an "emergency response," the response must be "to an occurrence which results, or is likely to result, in an *uncontrolled release* of a hazardous substance." *Id.* (emphasis added).  What does it mean for the release of a hazardous substance like ammonia to be "uncontrolled"? One commonly used dictionary explains that the word "control" means, among other things, "to limit the level [or] intensity" of something or—in the specific context of "a mechanical or scientific process"—to "regulate," as in "the airflow is controlled by a fan." *Control*, Oxford Dictionary of English 379 (3d ed. 2010).  Another defines the word "control," as relevant here, to mean "to exercise restraining or directing influence over" and to "regulate [or] curb," *Control*,

---

[2] Although the Secretary of Labor has asked us to defer to his interpretation of the HAZWOPER regulation, we decline to do so.  Generally, we defer to an agency's interpretation of its own regulation only if (1) the regulation is "'genuinely ambiguous,'" (2) the agency's interpretation is "'reasonable,'" and (3) "'the character and context'" of the interpretation entitle it to controlling weight. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019)).  For reasons explained in text, once the "traditional tools of construction" are brought to bear, the HAZWOPER regulation's "uncontrolled release" requirement is not genuinely ambiguous. *Rafferty*, 13 F.4th at 1179.

Webster's Third New International Dictionary 496 (1961), and defines that term's derivative "controlled" to mean "restrained, managed, or kept within bounds," or "conducted or maintained in accordance with fixed rules, restraints, or procedures," *id.*, *Controlled*. It follows, therefore, that an "*un*controlled" release is one that isn't regulated, restrained, or directed, or whose level or intensity isn't limited.[3]

Assessing whether a particular release was "uncontrolled" will often turn on the specific facts and circumstances of the situation. In making the uncontrolled-release determination, a court must inquire whether the entity charged with violating

---

[3] It should be noted that § 1910.120(a)(3)'s first sentence makes clear that it is the "release" itself, not the underlying "substance," that either was or wasn't "uncontrolled." The provision's second sentence, which effectively creates an exception to the first, operates a bit differently, making the "substance"—rather than the "release"—the object of "control[]." That sentence, again, states that "[r]esponses to incidental releases of hazardous substances where the *substance* can be absorbed, neutralized, or otherwise *controlled* at the time of release by employees in the immediate release area, or by maintenance personnel are not considered to be emergency responses within the scope of this standard." OSHA seems to conflate the first two sentences, arguing that Tampa Electric was engaged in an "emergency response" because the ammonia was "uncontrolled" once released. *See* Br. of Appellant at 33; Oral Arg. at 04:05–07:28. For better or worse, that's just not how the regulation operates, at least as promulgated. Because we conclude that the "release" itself wasn't "uncontrolled" within the meaning of § 1910.120(a)(3)'s first sentence—and thus the regulation's rule—we have no occasion to consider whether the "substance" (*i.e.*, the ammonia) "c[ould] be . . . controlled" within the meaning of the second sentence's exception.

HAZWOPER meaningfully regulated, restrained, or directed the release by limiting the amount of the substance emitted or the intensity of its emission. Contrary to the strongest version of Tampa Electric's position, it is not a complete answer that a plant facility operated according to plan. If, for instance, a plant were designed so that if a pipe became overpressurized, it would simply explode along a weak seam—thereby indiscriminately spewing its contents into the air—the plant owner couldn't defend by arguing that it had fashioned the pipe to explode just so, that its facility had performed precisely as designed, and therefore, that the release wasn't "uncontrolled." *See* Oral Arg. at 17:00–17:25, 33:02–33:20.

On the flip side, though, it can't be, as OSHA has at times insisted, that *any* release of a gaseous substance into the air, no matter how carefully regulated, restrained, and directed, is by definition "uncontrolled" simply because the gas may well disperse. *See id.* at 06:23–06:30. That's so for two reasons—one legal and the other practical. As a matter of law, OSHA's sweeping theory effectively reads the word "uncontrolled" out of the regulation, at least as it applies to releases of gas, contrary to the usual rule that "[i]f possible, every word and every provision is to be given effect" and "[n]one should be ignored." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). And as a matter of practice, it seems to us indisputable that a plant owner can take responsible steps to meaningfully limit the amount of gas released into the atmosphere and thereby mitigate harm.

Due to the myriad ways in which a release may occur, we doubt the existence of a bright-line rule for determining when a release is uncontrolled. Here, though, we are satisfied that Tampa Electric designed a response system to manage when, how, and to what extent ammonia would be emitted in the event of a pipe over-pressurization and thereby adequately "[]controlled" the release. A "release" is as much an ongoing "process" as a one-time event, *see Release*, Oxford Dictionary of English at 1500, and we hold that at each stage of the process here, Tampa Electric meaningfully regulated, restrained, and directed the release of ammonia at its plant. When the pipe overpressurization occurred, Tampa Electric's plant design controlled the release by (1) initially diverting some of the ammonia into the sump to be neutralized and then (2) venting excess, unabsorbable ammonia into the air. In so doing, Tampa Electric limited the amount of ammonia that was released into the air at any given time and prevented the overpressurized pipe from rupturing and releasing all its contents at once. And once the excess ammonia was in the air, Tampa Electric's rovers further controlled the release by isolating the ammonia valve and adding water to the sump so that the sump could absorb more of the chemical.

Accordingly, we hold that the release here was controlled—or, in the words of the regulation, that it wasn't "uncontrolled." Because the release wasn't uncontrolled, the response to it wasn't an "emergency response," and the HAZWOPER standard didn't

apply to the rovers' conduct.  And because the HAZWOPER standard didn't apply, Tampa Electric didn't violate it.

The petition for review is **DENIED** and the order of the Commission is **AFFIRMED**.